JANE A. AZZOLINO; LOUIS AZZOLINO; MICHAEL LAWRENCE AZZOLINO, BY HIS GENERAL GUARDIANS, JANE A. AZZOLINO AND LOUIS AZZOLINO; REGINA MARY GALLAGHER, BY HER GENERAL GUARDIAN, JANE A. AZZOLINO; AND DAVID JOHN AZZOLINO, BY HIS GENERAL GUARDIAN, LOUIS AZZOLINO v. JAMES R. DINGFELDER; JEAN DOWDY; AND ORANGE COUNTY COMPREHENSIVE HEALTH SERVICES, INC., DOING BUSINESS AS HAYWOOD-MONCURE COMMUNITY HEALTH CENTER

No. 718PA84

(Filed 10 December 1985)

1. Physicians, Surgeons and Allied Professions § 17.1— prenatal care—Down's Syndrome child—no cause of action for wrongful life

A claim for wrongful life on behalf of a Down's Syndrome child, based on the alleged negligent failure of defendants to properly advise the parents of the availability of genetic counseling and amniocentesis, is not cognizable at law in North Carolina. Life, even life with severe defects, cannot be an injury in the legal sense.

2. Physicians, Surgeons and Allied Professions § 17.1— parents of Down's Syndrome child—no cause of action for wrongful birth

An action for wrongful birth by the parents of a child born with Down's Syndrome is not cognizable at law in North Carolina and the trial court did not err by granting defendant's motions for directed verdicts. Courts which recognize such a claim do so by holding that the existence of a human life can constitute an injury or loss, a view of human life previously unknown to the law of North Carolina. Moreover, courts which have recognized claims for wrongful birth have failed to establish any trend with regard to the measure of damages to be allowed, issues concerning mitigation of damages have not been resolved, and the tort of wrongful birth would be particularly subject to fraudulent claims.

3. Physicians, Surgeons and Allied Professions § 17.1— no right of action by siblings of Down's Syndrome child

The trial court did not err by dismissing a medical malpractice claim by the siblings of a Down's Syndrome child where defendants' allegedly negligent failure to properly advise the mother concerning the availability of amniocentesis and genetic counseling prevented the termination of the pregnancy.

Justice EXUM dissenting.

Justice FRYE concurring in part and dissenting in part.

Justice MARTIN concurring in part and dissenting in part.

ON discretionary review of the decision of the Court of Appeals, 71 N.C. App. 289, 322 S.E. 2d 567 (1984) affirming in part and reversing in part orders entered December 14, 1982 by *Judge*

*Giles R. Clark* and judgment entered May 24, 1983 by *Judge Henry V. Barnette, Jr.,* in Superior Court, CHATHAM County. Heard in the Supreme Court September 9, 1985.

*Beskind and Rudolf, by Donald H. Beskind, Thomas K. Maher, Tim Hubbard and Mary Lunday Adams, for the plaintiff-appellees.*

*Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, by John H. Anderson, C. Ernest Simons, and Steven M. Sartorio, for the defendant-appellants.*

*Blanchard, Tucker, Twiggs, Earls & Abrams, P.A., by Douglas B. Abrams, for the North Carolina Academy of Trial Lawyers, amicus curiae.*

*Sharon Thompson, Nan D. Hunter, Janet Benshoof and Suzanne M. Lynn, for the American Civil Liberties Union Foundation, amicus curiae.*

*John A. Swem for the North Carolina Right to Life Education and Legal Defense Fund, amicus curiae.*

MITCHELL, Justice.

This appeal arises from a medical malpractice action brought by a child and his parents and siblings alleging that the defendants' negligent failure to advise the parents properly of the availability of amniocentesis and genetic counseling and negligent prenatal care of the mother prevented the termination of the mother's pregnancy by abortion and thereby resulted in the child's birth. The child is afflicted with Down's Syndrome, a genetic disorder characterized by mental retardation and physical abnormalities. We conclude that neither the parents' claim for relief for "wrongful birth," the child's claim for "wrongful life" nor the siblings' claim presents a claim upon which relief can be granted.

The plaintiffs brought this action seeking to recover for injuries allegedly arising from the birth of the plaintiff Michael L. Azzolino, the son of the plaintiffs Louis and Jane Azzolino and the half-brother of the plaintiffs Regina Gallagher and David Azzolino. The defendants named in the complaint are Orange-Chatham Comprehensive Health Services, Inc. (hereinafter "OCCHS"), Dr.

James R. Dingfelder, a specialist in obstetrics and gynecology who at all pertinent times was a professor in the University of North Carolina School of Medicine, and Jean Dowdy, a registered nurse and family nurse practitioner employed by OCCHS at the Haywood-Moncure Clinic (hereinafter "Clinic") operated by OCCHS in Chatham County.

The plaintiffs allege that Mrs. Azzolino received prenatal care at the Clinic during her pregnancy. While at the Clinic, she was under the care of the defendants Jean Dowdy and Dr. Dingfelder. As a result of a contract between the University of North Carolina and OCCHS, Dr. Dingfelder spent one-half day per week at the Clinic supervising the work of the family nurse practitioners and providing gynecological and obstetrical services to patients.

By the first claim for relief, the plaintiffs seek damages on behalf of the parents for the "wrongful birth" of Michael. The plaintiffs allege that the defendants were negligent in their prenatal care of Mrs. Azzolino in that they failed to advise the parents properly and incorrectly advised them with respect to the availability of amniocentesis and genetic counseling. Had the parents been properly advised, they allege that they would have had amniocentesis performed which would have shown that Mrs. Azzolino's pregnancy would result in a child with Down's Syndrome if allowed to go to term. Had she known that Michael would be afflicted with Down's Syndrome, the plaintiffs allege that Mrs. Azzolino would have terminated her pregnancy by an abortion.

By the second claim for relief, Michael Azzolino, through his parents as guardians, seeks to recover damages resulting from his "wrongful life." The plaintiffs allege that Michael has suffered compensable damages by virtue of his very existence afflicted with Down's Syndrome. The plaintiffs further allege that but for the defendants' negligence, Michael would not have suffered such damages because he would have been aborted while still a fetus.

In the third claim for relief, Michael's older siblings, Regina and David, allege that their brother's birth and life has forced them to endure family financial and emotional hardships associated with having a child with Down's Syndrome in the family and also has deprived them of the full measure of the society,

comfort, care and protection of their parents. They allege that their injuries in this regard were proximately caused by the defendants' negligence.

The plaintiffs allege that Dr. Dingfelder is liable for the negligence of the defendant Jean Dowdy under the doctrine of *respondeat superior*. They further allege that the defendant OCCHS is liable for the negligence of the other defendants by reason of the same doctrine.

By orders dated December 14, 1982 and filed on December 28, 1982, Judge Giles R. Clark granted motions of the defendants under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure to dismiss the claim for relief for wrongful life brought on behalf of Michael and the claim for relief on behalf of Michael's siblings. The case came on for trial of the claim for relief on behalf of the parents for wrongful birth. At the close of the plaintiffs' evidence at trial, Judge Henry V. Barnette, Jr. allowed the defendants' motions under Rule 50 of the North Carolina Rules of Civil Procedure for directed verdicts in their favor on the wrongful birth claim. On May 24, 1983 Judge Barnette entered judgment finally terminating the action. The plaintiffs appealed to the Court of Appeals.

The Court of Appeals affirmed the trial court's dismissal of the claim for relief on behalf of Regina Mary Gallagher and David John Azzolino, the minor siblings of Michael Azzolino. It also affirmed the trial court's directed verdict in favor of the defendant Jean Dowdy on the plaintiff parents' claim against her for wrongful birth. The Court of Appeals reversed the directed verdicts against the parents on their wrongful birth claim against the defendants Dr. James Dingfelder and OCCHS and also reversed the trial court's dismissal of Michael Azzolino's claim for wrongful life.

The Court of Appeals also addressed the measure of damages to be applied should Michael and his parents prevail at trial. The Court of Appeals concluded that Michael's wrongful life claim would not justify general damages for being born impaired "because of the impossibility of assessing such damages in any fair, nonspeculative manner." 71 N.C. App. at 300, 322 S.E. 2d at 576. It allowed recovery of special damages for the extraordinary expenses to be incurred during Michael's lifetime as a result of

his impairment. The Court of Appeals held that these damages were recoverable by the child with his parents being entitled to disbursements from the child's recovery for reasonable expenses for special care subject to the approval of the clerk of superior court. The Court of Appeals further concluded that it was appropriate to allow the parents to recover damages only for their mental anguish resulting from the existence of the impaired child, since they would be indirectly compensated for the child's extraordinary expenses from the damages he would recover under his wrongful life claim.

On February 28, 1985, we allowed the defendants' petition for discretionary review and the plaintiffs' cross-petition for discretionary review of additional issues. As we conclude that neither wrongful birth nor wrongful life claims are cognizable under the law of this jurisdiction, we affirm in part and reverse in part the decision of the Court of Appeals.

The terms "wrongful birth" and "wrongful life" are descriptive titles used in those jurisdictions which have recognized claims for relief of parents and children for negligent medical treatment or advice which deprives parents of the opportunity to abort a fetus in order to avoid the birth of a defective child. *E.g.*, *Procanik v. Cillo*, 97 N.J. 339, 347, 478 A. 2d 755, 760 (1984). "Wrongful life" refers to a claim for relief by or on behalf of a defective child who alleges that but for the defendant's negligent treatment or advice to its parents, the child would not have been born. *Id.* "Wrongful birth" refers to the claim for relief of parents who allege that the negligent treatment or advice deprived them of the choice of terminating pregnancy by abortion and preventing the birth of the defective child. *E.g.*, *James G. v. Caserta*, 332 S.E. 2d 872, 874 (W.Va. 1985). The various theories which have been relied upon to support these claims for relief have been discussed at length by numerous legal commentators in recent years. *See id.* at n. 4 (citations to numerous articles, comments and notes).

We emphasize at the outset that this appeal does not present a situation in which it is alleged that the defendants negligently injured a fetus and thus caused an otherwise normal child to be born in a defective condition. The plaintiffs do not allege that the negligence of the defendants caused Down's Syndrome in Michael Azzolino. Nor do the plaintiffs allege that Michael ever had a

chance to be a normal child. The essence of the plaintiffs' claims is that but for the negligence of the defendants, Michael would never have been born at all and he, his parents and his siblings would not have suffered from his affliction with Down's Syndrome.

Although we undertake to discuss separately the claims of the child, his siblings and his parents, we recognize that none of these claims may be considered properly in isolation. All of them arise from the same alleged negligence and allege as injury the life of the same defective child. Only the impact of the alleged negligence and injury upon the individual plaintiffs differs. Indeed, the few courts which have allowed the child's cause of action for wrongful life appear to have done so in part at least upon "the theory that it is illogical to give relief to the parents on a wrongful birth theory and not to the child in a wrongful life claim." *James G. v. Caserta,* 332 S.E. 2d at 880. Such courts have found it "anomalous to permit only parents, and not the child, to recover for the cost of the child's own medical care." *Turpin v. Sortini,* 31 Cal. 3d 220, 238, 182 Cal. Rptr. 337, 348, 643 P. 2d 954, 965 (1982). While we discuss each theory separately for reasons of convenience, we recognize that the "filaments of family life, although individually spun, create a web of interconnected legal interests." *Procanik v. Cillo,* 97 N.J. at 351, 478 A. 2d at 762, *quoting Schroeder v. Perkel,* 87 N.J. 53, 432 A. 2d 834 (1981).

I.

Wrongful Life

[1]   For purposes of considering whether the claim for relief on behalf of Michael Azzolino for wrongful life is cognizable under the law of this jurisdiction, we assume *arguendo* that the defendants owed a duty to him *in utero* as well as to his parents and that the defendants breached that duty and thereby proximately caused his birth. We further assume *arguendo* that had Michael's parents been accurately advised of the chances that their already conceived child would be afflicted with Down's Syndrome and of the availability of amniocentesis, they would have terminated the pregnancy by abortion. In applying traditional tort concepts to Michael's claim then, there remains the question of whether he has suffered any legally cognizable injury. In order to hold that

Azzolino v. Dingfelder

Michael has been "injured" in a legal sense, the Court of Appeals felt compelled to say that it was "unwilling, and indeed, unable to say as a matter of law that life even with the most severe and debilitating of impairments is always preferable to nonexistence." 71 N.C. App. at 300, 322 S.E. 2d at 576. We take a view contrary to that of the Court of Appeals. Therefore, we conclude that life, even life with severe defects, cannot be an injury in the legal sense.

We are aware that the decision of the Court of Appeals recognizing Michael Azzolino's claim for relief for wrongful life represents an honest and principled effort by that court to address and resolve genuine social problems thrust upon the courts by recent developments in science and medicine. We share the concerns expressed on behalf of plaintiffs such as Michael Azzolino by those courts allowing wrongful life claims. *See, e.g., Procanik v. Cillo,* 97 N.J. 339, 353, 478 A. 2d 755, 763 (1984) (a sensitive opinion by Mr. Justice Pollock recognizing wrongful life claims and expressing the view that courts should "seek only to respond to the call of the living for help in bearing the burden of their affliction."); *see also Turpin v. Sortini,* 31 Cal. 3d 220, 182 Cal. Rptr. 337, 643 P. 2d 954 (1982); *Harbeson v. Parke-Davis, Inc.,* 98 Wash. 2d 460, 656 P. 2d 483 (1983). Absent clear legislative guidance to the contrary, however, we find compelling the view of the Court of Appeals of New York in an earlier case involving a claim for wrongful life that:

> Whether it is better never to have been born at all than to have been born with even gross deficiencies is a mystery more properly to be left to the philosophers and the theologians. Surely the law can assert no competence to resolve the issue, particularly in view of the very nearly uniform high value which the law and mankind has placed on human life, rather than its absence. Not only is there to be found no predicate at common law or in statutory enactment for judicial recognition of the birth of a defective child as an injury to the child; the implications of any such proposition are staggering. Would claims be honored, assuming the breach of an identifiable duty, for less than a perfect birth? And by what standard or by whom would perfection be defined?
>
> . . . .

Simply put, a cause of action brought on behalf of an infant seeking recovery for wrongful life demands a calculation of damages dependent upon a comparison between the Hobson's choice of life in an impaired state and nonexistence. This comparison the law is not equipped to make . . . . Recognition of so novel a cause of action requiring, as it must, creation of a hypothetical formula for the measurement of an infant's damages is best reserved for legislative, rather than judicial, attention.

*Becker v. Schwartz*, 46 N.Y. 2d 401, 411-12, 413 N.Y.S. 2d 895, 900-01, 386 N.E. 2d 807, 812 (1978).

Although not determinative of our holding, we note that the overwhelming majority of jurisdictions which have been called upon to consider the issue have rejected claims for relief for wrongful life by children born afflicted with defects. Annotation, 83 A.L.R. 3d 15 (1978 & Supp. 1985). We hold that such claims for relief are not cognizable at law in this jurisdiction. We reverse that part of the decision of the Court of Appeals reversing the trial court's dismissal of the claim for relief for wrongful life.

II.

Wrongful Birth

[2] We next consider the claim for relief for wrongful birth brought on behalf of the plaintiff parents Mr. and Mrs. Azzolino. The jurisdictions which have reached the merits of claims for wrongful birth currently appear to be almost unanimous in their recognition of them when but for the defendants' negligence, the parents would have terminated the defective fetus by abortion. *See generally*, Annotation, 83 A.L.R. 3d 15 (1978 & Supp. 1985). Although we do not lightly adopt a view contrary to such a strong trend among other jurisdictions, we nevertheless hold that claims for relief for wrongful birth of defective children shall not be recognized in this jurisdiction absent a clear mandate by the legislature.

We again assume *arguendo* that the defendants owed the plaintiffs a duty and that they breached that duty. The issue of whether the breach of duty was the proximate cause of the "injury" to the plaintiff parents is more problematic, since even the

plaintiffs acknowledge that the fetus which was to be Michael Azzolino was in existence and already genetically defective at the time the defendants first came into contact with the plaintiffs. We also assume *arguendo*, however, that the birth of Michael Azzolino was the proximate result of the defendants' negligence.

Courts which purport to analyze wrongful birth claims in terms of "traditional" tort analysis are able to proceed to this point but no further before their "traditional" analysis leaves all tradition behind or begins to break down. In order to allow recovery such courts must then take a step into *entirely untraditional analysis* by holding that the existence of a human life can constitute an injury cognizable at law. Far from being "traditional" tort analysis, such a step requires a view of human life previously unknown to the law of this jurisdiction. We are unwilling to take any such step because we are unwilling to say that life, even life with severe defects, may ever amount to a legal injury.

It should be reemphasized here that the plaintiffs only allege that the defendants negligently caused or permitted an already conceived and defective fetus not to be aborted. The plaintiffs do not allege that the defendants in any way directly caused the genetic defect. Therefore, the only damages the plaintiffs allege they have suffered arise, if at all, from the failure of the defendants to take steps which would have led to abortion of the already existing and defective fetus.

Courts which have recognized claims for wrongful birth have failed to establish a clear trend or any real trend at all with regard to the measure of damages to be allowed. *See generally*, Annotation 83 A.L.R. 3d 15 (1978 & Supp. 1985); Collins, An Overview and Analysis: Prenatal Torts, Preconception Torts, Wrongful Life, Wrongful Death, and Wrongful Birth: Time for a New Framework, 22 J. Fam. L. 677 (1983-84) (hereinafter cited as "Collins"); Comment, Recovery of Child Bearing Expenses in Wrongful Birth Cases: A Motivational Analysis, 32 Emory L.J. 1167 (1983) (hereinafter cited as "A Motivational Analysis"). Under traditional theories of tort law, defendants are liable for all of the reasonably foreseeable results of their negligent acts or omissions. *Kanoy v. Hinshaw*, 273 N.C. 418, 160 S.E. 2d 296 (1968); *Toone v. Adams*, 262 N.C. 403, 137 S.E. 2d 132 (1964); Collins, 22 J. Fam. L. 677

(1983-84). But few if any jurisdictions appear ready to apply this traditional rule of damages with full vigor in wrongful birth cases.

Some courts have allowed the parents to recover the extraordinary expenses resulting from the child's impairment but not the expenses they would normally incur in rearing the child. *See* Collins, 22 J. Fam. L. 677 (1983-84); A Motivational Analysis, 32 Emory L.J. 1167 (1983). Other courts have permitted damages only for the parents' pain, suffering and mental anguish resulting from the birth of the defective child. *Id.* Others have allowed both the extraordinary expenses and recovery for mental anguish. At least one court has allowed parents to recover all expenses involved in rearing the child with no reduction of the damages awarded by the cost of rearing a normal child. *See Robak v. United States,* 658 F. 2d 471 (7th Cir. 1981) (applying Alabama law).

Courts allowing parents' wrongful birth claims have also been unable to resolve issues concerning the extent to which traditional tort concepts requiring plaintiffs to take reasonable steps to mitigate or reduce damages are to be applied in wrongful birth cases. They have for example been unable to reach anything resembling a consensus as to whether damages in wrongful birth cases should be reduced or offset by any emotional or other benefits accruing to the parents by reason of the life, love and affection of the defective child. Collins, 22 J. Fam. L. 677 (1983-84). Likewise, they have been unable to reach any consensus on the issue of whether there is a duty on the part of the parents to place the child for adoption in order to reduce their damages. *See generally,* Note, 53 Fordham L. Rev. 1107, 1114-18 (1985); *see also Rieck v. Medical Protective Co.,* 64 Wis. 2d 514, 517, 219 N.W. 2d 242, 245 (1974).

Perhaps the uncertainty and lack of uniformity among courts concerning both the proper measure of damages and the duty to mitigate damages in wrongful birth cases arises at least in part from a failure to recognize that the "injury" for which they seek to compensate the plaintiffs is the existence of a human life. As a result:

> Although courts and commentators have attempted to make it such, wrongful birth is not an ordinary tort. It is one thing to compensate destruction; it is quite another to com-

pensate creation. This so-called "wrong" is unique: It is a new and on-going condition. As life, it necessarily interacts with other lives. Indeed, it draws its "injurious" nature from the predilections of the other lives it touches. It is naive to suggest that such a situation falls neatly into conventional tort principles, producing neatly calculable damages.

Note, 13 Val. U.L. Rev. 127, 170 (1978).

Further, as the "injury" suffered arises not just from the existence of the afflicted human life in question but from the "predilections of the other lives it touches," the tort of wrongful birth will be peculiarly subject to fraudulent claims. The wrongful birth claim will almost always hinge upon testimony given by the parents after the birth concerning their desire prior to the birth to terminate the fetus should it be defective. The temptation will be great for parents, if not to invent such a prior desire to abort, to at least deny the possibility that they might have changed their minds and allowed the child to be born even if they had known of the defects it would suffer. *See Rieck v. Medical Protective Co.*, 64 Wis. 2d at 519, 219 N.W. 2d at 245.

Additionally, since the parents will decide which "defects" would have led them to abort the fetus, other questions will rapidly arise in jurisdictions recognizing wrongful birth claims when determining whether such claims will be permitted in particular cases. When will parents in those jurisdictions be allowed to decide that their child is so "defective" that given a chance they would have aborted it while still a fetus and, as a result, then be allowed to hold their physician civilly liable? When a fetus is only the carrier of a deleterious gene and not itself impaired? When the fetus is of one sex rather than the other? Should such issues be left exclusively to the parents with doctors being found liable for breaching their duty to inform parents of any fetal conditions to which they know or should know the parents may object? When considering such questions it must constantly be borne in mind that pregnant women have been recognized as having an absolute constitutional right, at least until a certain point in their pregnancy, to have an abortion performed for any reason at all or for no reason. *See Planned Parenthood Assn. v. Ashcroft*, 462 U.S. 476 (1983); *Roe v. Wade*, 410 U.S. 113 (1973).

As medical science advances in its capability to detect genetic imperfections in a fetus, physicians in jurisdictions recognizing claims for wrongful birth will be forced to carry an increasingly heavy burden in determining what information is important to parents when attempting to obtain their informed consent for the fetus to be carried to term. Inevitably this will place increased pressure upon physicians to take the "safe" course by recommending abortion. This is perhaps best illustrated by a story drawn from a real life situation.

> A clinical instructor asks his students to advise an expectant mother on the fate of a fetus whose father has chronic syphilis. Early siblings were born with a collection of defects such as deafness, blindness, and retardation. The usual response of the students is: "Abort!" The teacher then calmly replies: "Congratulations, you have just aborted Beethoven."

Trotzig, The Defective Child and the Actions for Wrongful Life and Wrongful Birth, 14 J. Fam. L. 15, 38-39 (1980), *quoting* Feinman, *Getting Along with the Genetic Genie*, Legal Aspects of Med. Prac. 38 (March 1979). Although it is not the controlling consideration in our rejection of claims for wrongful birth, we do not wish to create a claim for relief which will encourage such results.

It should be readily apparent even to the most casual reader of the pertinent cases that both the theories upon which recovery is allowed and the measure of damages applied by the various courts recognizing claims for wrongful birth are so varied as to almost exceed the number of courts which have decided them. New Jersey, for example, has taken at various times at least three distinct positions as to the theories upon which recovery must be based and the appropriate measure of damages in wrongful birth and wrongful life cases. *Compare Procanik v. Cillo*, 97 N.J. 339, 478 A. 2d 755 (1984), *with Berman v. Allan*, 80 N.J. 421, 404 A. 2d 8 (1979), *and Gleitman v. Cosgrove*, 49 N.J. 22, 227 A. 2d 689 (1967).

In light of such developments, we find particularly prophetic the words of Judge Wachtler in his dissent from that part of the majority opinion of the Court of Appeals of New York first recognizing a claim for relief for wrongful birth in that State. He agreed with the majority's view that claims for wrongful life

should not be recognized. He would also have denied claims for wrongful birth, however, because:

> A doctor who provides prenatal care to an expectant mother should not be held liable if the child is born with a genetic defect. Any attempt to find the physician responsible, even to a limited extent, for an injury which the child unquestionably inherited from his parents requires a distortion or abandonment of fundamental legal principles and recognition, by the courts, of controversial rights and duties more appropriate for consideration and debate by a legislative body. These problems, which are always present when the child born with a genetic disorder seeks to hold the doctor responsible, are compounded when the parents seek compensation, on their own behalf, for collateral injuries occasioned by emotional distress or the increased cost of caring for a handicapped child.

> The heart of the problem in these cases is that the physician cannot be said to have caused the defect. The disorder is genetic and not the result of any injury negligently inflicted by the doctor. In addition, it is incurable and was incurable from the moment of conception. Thus the doctor's alleged negligent failure to detect it during prenatal examination cannot be considered a cause of the condition by analogy to those cases in which the doctor has failed to make a timely diagnosis of a curable disease. The child's handicap is an inexorable result of conception and birth.

> . . . .

> In sum, by holding the doctor responsible for the birth of a genetically handicapped child, and thus obligated to pay most, if not all, of the costs of lifetime care and support, the court has created a kind of medical paternity suit. It is a tort without precedent, and at variance with existing precedents both old and new. Indeed the members of the majority are divided among themselves as to what principle of law requires the doctor to pay damages in this case. The limits of this new liability cannot be predicated. But if it is to be limited at all it would appear that it can only be confined by drawing arbitrary and artificial boundaries which a majority of the court consider popular or desirable. This alone should

be sufficient to indicate that these cases pose a problem which can only be properly resolved by a legislative body, and not by courts of law.

*Becker v. Schwartz*, 46 N.Y. 2d at 417-22, 413 N.Y.S. 2d at 904-07, 386 N.E. 2d 807 at 816-19 (1978) (Wachtler, J. dissenting in part).

We recognize that each of the opinions rendered in the various American jurisdictions allowing wrongful birth claims since Judge Wachtler wrote his words of warning have represented conscientious efforts by principled jurists to address legitimate social problems. The results have made it apparent, however, that courts in those jurisdictions have in fact been required to confine the extent of liability just as predicted, "by drawing arbitrary and artificial boundaries which a majority of the court consider popular or desirable." *Id.* Having the benefit of hindsight not available to the majority of New York's highest court in *Becker*, we now share Judge Wachtler's view that the myriad problems arising from claims for wrongful life and wrongful birth can be resolved properly only by a legislative body. They have not been and will not be resolved properly by courts attempting to apply "traditional" tort notions which simply do not fit or which courts steadfastly refuse to apply with their full vigor.

To the extent our legislature has spoken to date, it has tended to discourage holding physicians or nurses liable for not acting in a manner which will result in abortion. *See* N.C.G.S. 14-45.1(e) and (f). However, the legislature has not spoken directly to the issues presented by this appeal.

The General Assembly of North Carolina, as a coordinate and equal branch of our government, is better suited than this Court to address the issues raised by this case. Only that body can provide an appropriate forum for a full and open debate of all of the issues arising from the related theories of "wrongful" birth and "wrongful" life. Unlike courts of law, the General Assembly can address all of the issues at one time and do so without being required to attempt to squeeze its results into the mold of conventional tort concepts which clearly do not fit.

As we hold today that claims for relief for wrongful birth are not cognizable at law in this jurisdiction, the trial court erred in

denying the defendants' motions under Rule 12(b)(6) to dismiss the claim on behalf of the plaintiff parents for failure to state a claim upon which relief can be granted. However, the trial court's later action in directing a verdict for the defendants and against the plaintiff parents cured the prior error of denying the motion to dismiss in the present case. Therefore, the Court of Appeals erred in reversing the trial court's action of allowing the defendants' motions for directed verdicts with regard to the wrongful birth claim. The decision of the Court of Appeals in this regard is reversed.

## III.

### The Siblings' Claim

[3] In their cross-petition for discretionary review, the plaintiffs sought to bring forward for this Court's review the claim on behalf of Michael's minor siblings. Our action in allowing the cross-petition brought this issue forward for review. The plaintiffs chose not to brief or argue the issue before this Court. Nevertheless, in our discretion we have reviewed the briefs filed in the Court of Appeals with regard to the issue as well as the authorities relied upon. For the reasons set forth and discussed in detail in the opinion of the Court of Appeals, we affirm that part of the decision of the Court of Appeals which affirmed the trial court's dismissal of the siblings' claim under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

For the foregoing reasons we hold that neither claims for wrongful birth nor claims for wrongful life are cognizable at law in this jurisdiction. We also reject the related claim of the siblings. The decision of the Court of Appeals is affirmed in part and reversed in part and this action is remanded to the Court of Appeals with instructions to reinstate the orders and judgment of the trial court.

Affirmed in part, reversed in part and remanded.

Justice EXUM dissenting.

I dissent from that portion of the majority's opinion which holds that Michael Azzolino's parents have no actionable claim against the defendants Dr. Dingfelder and Orange-Chatham Com-

prehensive Health Services, Inc. Although the cases from our sister jurisdictions do not control us, the majority recognizes that all of them find an actionable claim under circumstances here presented. These cases differ as to the appropriate measure of damages. My view of the claim's validity and the appropriate measure of damages follows.

First, I would note what this case may seem to be, but is not. Although this case may seem to present many thorny moral, philosophical, and theological questions, not the least of which involves our views concerning the abortion issue, we need not address any of those difficult areas. This case becomes much less problematic when expressed in its simplest terms: whether an obstetrician's alleged negligent failure to inform or to inform accurately his patient concerning relevant facts, risks, and procedures indicated in light of her condition gives rise to an actionable claim for damages proximately caused by this failure. The simple application of traditional tort concepts compels an affirmative answer.

Although I might personally believe that life in any condition is always preferable to nonexistence, I am not willing to accept the majority's stance that this philosophy precludes the recognition of a cognizable and compensable legal injury to Michael's parents under the circumstances of this case.

The legal injury in this case is not Michael's life, or even his impaired life. Although Michael's life exists because of defendants' alleged negligence, his parents were not injured by his existence. They were injured when they were deprived of information they needed to make an informed choice whether to allow their child to come to term. The right of a woman to seek an abortion free from state interference is recognized by the legislature. N.C.G.S. § 14-45.1(a) (1981). It seems to me the upshot of this legislation is to place the right to choose whether to bear or not to bear a conceived child in the hands of its parents. Parents, and in this case Michael's parents, should be the ones to make the choice and bear the responsibility for it. Defendants by negligently providing wrong information or failing to provide proper information the Azzolinos were entitled to have prevented them from making an informed choice for themselves, and, in effect, substituted defendants' choice for theirs. For this injury, not

Michael's existence, defendants should be subject to whatever damages may reasonably be attributed to the injury.

The majority worries that prospective plaintiff parents will invent a prior desire to abort to support a claim, and that physicians will be held civilly liable by parents who, perhaps on a whim, decide that their child is "defective" and would have been aborted had the defect been known early in the pregnancy. The majority carries these concerns to the conclusion that physicians will be pressured into taking the "safe" course by recommending abortion and giving advice to that effect.

I do not find these concerns persuasive, or even pertinent. A physician need not, indeed should not, advise a patient on whether or not to abort a child. A physician's responsibility is simply to exercise due care to provide the information necessary for the *patient* to make an informed decision. If physicians do this, they need not fear a lawsuit if parents bear a child of one sex rather than the other, or even a child with congenital defects. The physician will not be liable for the patient's informed decision on the abortion question. To deny, as the majority does, any remedy for a physician's negligently withholding information or negligently providing misinformation so immunizes the physician as to encourage the physician himself, in effect, to make the abortion decision.

Finally, the majority opinion quotes from the dissent in *Becker v. Schwartz*, 46 N.Y. 2d 401, 413 N.Y.S. 2d 895, 386 N.E. 2d 807 (1978), to the effect that if the physician did not cause the child's handicap, that condition is an "inexorable result of conception and birth." *Id.* at 46 N.Y. 2d at 417-22, 413 N.Y.S. 2d at 904-07, 386 N.E. 2d at 816-19 (Wachtler, J., dissenting in part). Birth is not, however, inexorable. As plaintiffs here allege, Mrs. Azzolino would have undergone an abortion had she been informed fully and accurately.

Measuring the damages reasonably attributable to the injury to Michael's parents does not seem to me to be a difficult problem. I would hold that Michael's parents are entitled to the extraordinary medical and living expenses attributable to the child's Down's Syndrome and the pain, suffering, and mental anguish this impairment caused them. As with any question involving computation of damages, properly identifying the claimant's loss is

central to the task. The method I would choose to identify the loss to Michael's parents is one based on their expectations.

According to plaintiffs' allegations, the negligence of defendants prevented Michael's parents from making an informed decision whether to bear him. This negligence caused a child to be born, Michael's parents allege, that would not otherwise have been born. Michael's parents, however, had decided to carry their child to term and become parents, not expecting that their child had Down's Syndrome. They were prepared to incur the expenses of giving birth to and raising a child without that disorder. If they received all expenses of childbearing and childrearing when they were committed to bearing these expenses had their child been normal, they would receive a windfall. They would receive amounts not reasonably attributable to the injury of which they complain. They should receive the extraordinary medical and other expenses attributable to Down's Syndrome but not other childbearing or childrearing expenses.

These extraordinary expenses can be calculated with reasonable certainty. Michael's exceptional needs can be forecast from the needs of many other children like him who suffer from Down's Syndrome. These needs give rise to certain provable expenses.

Michael's parents also should be compensated for any mental anguish they prove they have suffered as a result of Michael's birth with Down's Syndrome. Although plaintiffs could introduce evidence from similarly situated parents to illustrate typical emotional burdens in cases such as this, these damages cannot be calculated with the same empirical accuracy as the extraordinary expenses they will likely incur. Jurors, nevertheless, are capable of determining intangible, nonpecuniary losses. In wrongful death actions, for example, jurors are required to evaluate damages for such intangible items as loss of society, companionship, comfort, guidance and kindly offices of the decedent. N.C.G.S. § 28A-18-2(b)(2), (4). They routinely determine pain and suffering in personal injury actions. A jury, through its shared understanding of the human condition, should be capable of awarding reasonable compensation for the pain, suffering, and mental anguish Michael's parents experienced from his birth with Down's Syndrome.

A jury's award if made for the mental anguish Michael's parents suffered because of Michael's birth with Down's Syndrome should not be offset by the intangible benefits that will accrue to them as parents, including the love and affection of Michael. This issue is the mirror image of the issue dealt with above relating to ordinary expenses of childrearing. The Azzolinos expected to be parents, albeit of a healthy child. Just as they were prepared to incur the expenses of raising a child, they were anticipating the benefits which accompany that experience. If they must bear so much of the cost of raising Michael as they would have incurred if he were born healthy, they are entitled to the benefits they would have likewise received.

I vote to affirm the Court of Appeals insofar as it affirmed the trial court's denial of defendants' motion to dismiss Michael Azzolino's parents' claim for relief. I also conclude plaintiffs' evidence in support of the parents' claim is sufficient to survive a motion for directed verdict and vote to affirm the Court of Appeals' reversal of the trial court's directed verdict in favor of defendants on this claim.

Justice FRYE concurring in part and dissenting in part.

I concur in the holding of part III of the majority opinion with respect to the siblings' claim. I concur in the result reached by the majority in denying the wrongful life claim on behalf of the child.

I dissent from that portion of the opinion which denies the validity of a medical malpractice claim in this State on behalf of the parents for the wrongful birth of an unhealthy child. The decision of the majority is contrary to that reached by the great majority of courts which have considered such a claim. *See generally* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on the Law of Torts*, p. 372 (5th ed. 1984). The fact that courts differ as to the measure of damages in such cases is insufficient reason to deny the validity of the underlying claim. This Court should recognize the validity of the claim and determine an appropriate measure of damages, while realizing that the General Assembly of North Carolina could, by appropriate legislation, adopt a new or different standard.

Justice MARTIN concurring in part and dissenting in part.

I concur in the holding of part III of the majority opinion with respect to the siblings' claim. In sum, the defendant Dingfelder owed no duty to them concerning genetic counselling and informed consent.

Further, I concur in the result reached by the majority with respect to Michael's claim, but for different reasons. In its activist rush to decide what is basically a social issue: whether life can be an injury in a legal sense, the majority makes several assumptions "arguendo" which clearly are not supported by the record. First, that Dr. Dingfelder owed Michael a duty "in utero" and, second, that he breached this duty to the fetus, Michael. Although defendant Dingfelder had a duty not to negligently injure the fetus, Michael, *Gay v. Thompson*, 266 N.C. 394, 146 S.E. 2d 425 (1966), he had no duty to the *fetus* to provide the fetus or its parents with proper genetic counselling. Dr. Dingfelder did not undertake to render professional services to Michael as a fetus with respect to genetic counselling. *See Hunt v. Bradshaw*, 242 N.C. 517, 88 S.E. 2d 762 (1955). Because Dr. Dingfelder owed no duty to the fetus, Michael, respecting genetic counselling, he cannot be found liable to Michael on this basis. By relying upon unfounded assumptions, the majority has reached an issue not necessary for a principled disposition of Michael's claim. For these reasons I agree that Michael's alleged claim is subject to dismissal.

I cannot concur in the majority opinion as to the claim of Jane and Louis Azzolino, parents of Michael Azzolino. As the majority concedes, its opinion with respect to this claim is out of step with all jurisdictions that have decided this issue on the merits.

Although the majority tags plaintiffs' claim as being for "wrongful birth," it is in actuality a malpractice action based upon the doctor's negligent genetic counselling and treatment of Mrs. Azzolino, depriving them of the ability to make an informed decision on whether to abort the fetus. *See generally* Note, *Azzolino v. Dingfelder: North Carolina Court of Appeals Recognizes Wrongful Birth and Wrongful Life Claims*, 63 N.C.L. Rev. 1329 (1985). We have a statute governing causes of action based upon

lack of informed consent. N.C.G.S. 90-21.13 states in pertinent part:

> (1) The action of the health care provider in obtaining the consent of the patient or other person authorized to give consent for the patient was in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities; and

> (2) A reasonable person, from the information provided by the health care provider under the circumstances, would have a general understanding of the procedures or treatments and of the usual and most frequent risks and hazards inherent in the proposed procedures or treatments which are recognized and followed by other health care providers engaged in the same field of practice in the same or similar communities; or

> (3) A reasonable person, under all the surrounding circumstances, would have undergone such treatment or procedure had he been advised by the health care provider in accordance with the provisions of subdivisions (1) and (2) of this subsection.

The statute establishes an objective test to determine whether the patient would have undergone the procedure (here, abortion) had she been advised in accordance with the statute. *Nelson v. Patrick*, 58 N.C. App. 546, 293 S.E. 2d 829 (1982). The statute codifies the standard required of health care providers concerning proper advice to a patient for the purpose of making an informed decision or consent as to medical procedures.

Plaintiffs' evidence tended to show, and the majority concedes, that the negligence of Dr. Dingfelder proximately resulted in the birth of Michael, a Down's syndrome child. Damages resulted to plaintiffs, which will be later discussed. This evidence made out a case for the jury and the trial court erred in directing a verdict against plaintiffs. N.C. Gen. Stat. § 90-21.13 (1981).

The majority evidently fears that by allowing plaintiffs' claim to go to the jury, it is "creating" or "recognizing" some new cause

of action. Its fears are unfounded. Plaintiffs' claim is not based upon the theory that the *existence* of a human life constitutes an injury. It is the negligent *birth* of the child that constitutes the injury.[1]

Most of the recent cases of this nature have been resolved on traditional tort grounds. *See, e.g., Procanik v. Cillo,* 97 N.J. 339, 478 A. 2d 755 (1984); *Turpin v. Sortini,* 31 Cal. 3d 220, 643 P. 2d 954 (1982). When analyzed on this basis, it is clear that plaintiffs made out a case for the jury. Dr. Dingfelder owed plaintiffs the duty to properly advise them concerning the possibility of genetic defects and the diagnostic procedures that could be utilized to discover genetic disorders in the fetus. He negligently failed to do so. The evidence on this issue was especially strong in the light of Mrs. Azzolino's specific request of the doctor about amniocentesis and in view of the history of the use of amniocentesis in her family. Plaintiffs testified that had they been properly advised, Mrs. Azzolino would have undergone the amniocentesis procedure and, upon disclosure of the Down's syndrome, the fetus would have been aborted. The evidence is sufficient to support a jury finding that a reasonable person under all the circumstances would have submitted to an abortion had she been advised by the doctor in a nonnegligent manner. N.C. Gen. Stat. 90-21.13(a)(3) (1981).

The majority's concern for fraudulent claims is unfounded. It assumes that the parents will decide which defects in the child would have led them to an abortion. It raises illusory bug-a-boos that the parents would abort because the child was the wrong sex or for some other fanciful reasons. This argument fails because it overlooks the statute, N.C.G.S. 90-21.13, that establishes an objective standard to determine whether the patient would have undergone an abortion. Recovery is not predicated on the after-the-fact whim of the parents, but upon the standard of what a

---

1. Examples of parental suits for undiscovered genetic defects include *Phillips v. United States,* 508 F. Supp. 544 (D.S.C. 1980) (Down's syndrome); *Gildiner v. Thomas Jefferson Univ. Hosp.,* 451 F. Supp. 692 (E.D. Pa. 1978) (Tay-Sachs disease); *Call v. Kazirian,* 135 Cal. App. 2d 189, 185 Cal. Rptr. 103 (1982) (Down's syndrome); *Schroeder v. Perkel,* 87 N.J. 53, 432 A. 2d 834 (1981) (cystic fibrosis); *Berman v. Allen,* 80 N.J. 421, 404 A. 2d 8 (1979) (Down's syndrome); *Becker v. Schwartz,* 46 N.Y. 2d 401, 386 N.E. 2d 807, 413 N.Y.S. 2d 895 (1978) (Down's syndrome); *Park v. Chessin,* 60 A.D. 2d 80, 400 N.Y.S. 2d 110 (1977) (polycystic kidney disease), *aff'd sub nom. Becker v. Schwartz,* 46 N.Y. 2d 401, 386 N.E. 2d 807, 413 N.Y.S. 2d 895 (1978).

reasonable person would have done under the same or similar circumstances. N.C. Gen. Stat. § 90-21.13(a)(3).

The majority's principal difficulty in resolving this issue appears to be its reluctance to determine the proper measure of damages. If one stays with the common law tort principles, the problem is not insurmountable. Plaintiffs are entitled to recover all damages proximately resulting from Dr. Dingfelder's negligence, just as in any tort action. Because plaintiffs planned to have a child, they intended to provide the ordinary and normal expenses of rearing a child to the age of majority. (Plaintiff husband has an equal duty to maintain and support his child. N.C. Gen. Stat. § 50-13.4(b) (1984). *See Flippin v. Jarrell,* 301 N.C. 108, 270 S.E. 2d 482 (1980).) Therefore, plaintiffs cannot recover for the ordinary and normal expenses of rearing a child to its majority.

Plaintiffs are entitled to recover compensation for the costs and expense of the childbirth, Mrs. Azzolino's pain and suffering accompanying the childbirth, the mental anguish suffered, and the extraordinary costs incurred in rearing their Down's syndrome child. *See Harbeson v. Parke-Davis, Inc.,* 98 Wash. 2d 460, 656 P. 2d 483 (1983); *Eisbrenner v. Stanley,* 106 Mich. App. 357, 308 N.W. 2d 209 (1981). Of course, plaintiffs have the burden to prove their damages by the greater weight of the evidence.

Such damages as plaintiffs prove would be subject to an offset or reduction by any benefits defendant Dingfelder may prove plaintiffs received from the birth of the child. Restatement (Second) of Torts § 920 (1979); *Eisbrenner,* 106 Mich. App. 357, 308 N.W. 2d 209.

Child support expenses are determined by judges and juries in North Carolina every court week. Doing so in this case would not burden the fact finder with an unusual or burdensome task. Such expenses are traditionally awarded to parents in recognition of their duty to provide support for their child. N.C. Gen. Stat. § 50-13.4(b) (1984).

Strong policy reasons support plaintiffs' claim: tort-feasors should be responsible in damages for the harm they proximately cause; medical malpractice suits are one method of improving the delivery of proper health services; genetic counselling and treatment should not be excepted from medical malpractice actions;

prosecution of the parental claim demonstrates the high value our society places on the family unit, 3 R. Lee, *N.C. Family Law* § 241 (4th ed. 1981); such claims support parents in carrying out their duty of maintaining their children, N.C. Gen. Stat. § 50-13.4(b).

Finally, the majority opinion appears to violate section 18 of article I of the North Carolina Constitution: "All courts shall be open; every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law; and right and justice shall be administered without favor, denial, or delay."

The majority concedes that Dr. Dingfelder owed a duty to Mr. and Mrs. Azzolino with respect to genetic counselling and treatment and that he breached that duty, proximately resulting in the birth of Michael. From this birth plaintiffs suffered damages. This constitutes a valid cause of action. *Hunt v. Bradshaw*, 242 N.C. 517, 88 S.E. 2d 762; N.C. Gen. Stat. § 90-21.13. The plaintiffs, having established a tort cause of action, are protected by the open courts clause of our constitution. This provision of the constitution is binding upon this Court. *See Osborn v. Leach*, 135 N.C. 628, 47 S.E. 811 (1904); *Bolick v. American Barmag Corp.*, 54 N.C. App. 589, 284 S.E. 2d 188 (1981), *aff'd*, 306 N.C. 364, 293 S.E. 2d 415 (1982). *See also Pentuff v. Park*, 194 N.C. 146, 138 S.E. 616 (1927). Under these circumstances, plaintiffs have a constitutional right to a judicial forum in which to litigate their claim. The decision of the majority violates that constitutional right.

It is submitted that if the public policy of the state would protect the medical profession from such claims, that is a matter within the province of the General Assembly, not this Court. Whether the legislature can constitutionally abolish altogether a common law cause of action is an open question in this jurisdiction. *Lamb v. Wedgewood South Corp.*, 308 N.C. 419, 302 S.E. 2d 868 (1983). Certainly this Court should not do so.

I find that the trial court erred in allowing defendants' motion for directed verdict as to this issue.