The plaintiffs are Karen and Danny Keel, parents of Justin Keel, who was born on January 18, 1985, with severe multiple congenital abnormalities. Justin died in February 1991, at the age of six. The defendants are Warren Banach, M.D., who was Karen's doctor and who performed the sonographic examinations of the fetus, and his professional corporation. The Keels charged the defendants with medical malpractice in failing to discover several severe, life-threatening fetal abnormalities that, the Keels say, had they been known to them, would have caused them to terminate the pregnancy. Actions such as that filed by the Keels have come to be called actions for "wrongful birth."
The trial judge entered a summary judgment for the defendants, holding, as a matter of law, that no cause of action for wrongful birth, or damages for wrongful birth, are recognized in the State of Alabama. The plaintiffs appealed. We reverse and remand.
Rule 56, A.R.Civ.P., sets forth a two-tiered standard for determining whether to enter a summary judgment. In order to enter a summary judgment, the trial court must determine: 1) that there is no genuine issue of material fact, and 2) that the moving party is entitled to a judgment as a matter of law.
The sole issue on appeal is whether this State recognizes a cause of action for wrongful birth. At the outset, we must emphasize the posture in which this case is now before this Court: The question presented for review is not whether the plaintiffs should ultimately prevail in this litigation, but whether their complaint states a claim upon which relief can be granted.
On October 22, 1984, Karen Keel had her first prenatal visit with Dr. Banach, an obstetrician practicing in Ozark, Alabama. There is conflicting testimony as to the content of the conversations between the physician and his patient pertaining to the couple's medical history. The Keels say that they relayed their concerns regarding this pregnancy because Danny had earlier fathered a stillborn infant with anencephaly, the congenital absence of brain and spinal cord, which is the most severe of spinal cord abnormalities. Spinal cord defects are known to be hereditary, and the Keels contend that they told Dr. Banach that they did not want their child to suffer such a fate.
Dr. Banach did a sonogram on October 26, 1984. He derived a biparietal diameter consistent with 19 weeks' gestation, and a femur length consistent with 22 weeks' gestation. Under "obvious anomalies" he wrote: "none seen." The Keels say that, to alleviate their fears, Dr. Banach moved the transducer around to show them what appeared to be a healthy fetus's head, body, arms, and legs. The sonogram machine produced several photographs of the sonographic images. Two were given to Karen.
Another sonogram was performed on January 4, 1985. Again Dr. Banach marked under "obvious anomalies" "none seen." During this sonogram, Dr. Banach determined that the fetus was a male. As during the first sonogram, the machine produced photographs, and all were retained in the medical records.
Justin was born on January 18, 1985, with severe multiple congenital abnormalities. He had only a two-vessel umbilical cord (as opposed to the normal three-vessel cord), a short cord, ventriculomegaly, absent right leg, imperforate anus, one testicle, one kidney, a vertebrae anomaly in the lumbar sacral region, hydrocephaly,[1] a large fluid-filled sac extending off the right aspect of the sacrum consistent with meningocele (spina bifida). Justin underwent numerous surgeries during his life. A shunt from his brain to his heart channeled fluids, which, for the most part, prevented any brain damage due to the hydrocephaly. Blood clots from the heart, impregnating the lungs, a known but *Page 1024 
unpreventable risk of the shunt, were the direct cause of Justin's death.
According to Dr. Banach, the fact that Danny had fathered a stillborn with anencephaly was not revealed to him until after Justin was born.
The Keels sued Dr. Banach, alleging that he had failed to meet the standard of prenatal care and that, had he done so, he would have further investigated questionable sonogram findings. The plaintiffs contend that there were discrepancies in the fetus measurements that should have prompted further investigation. They contend that there were images on the sonogram that showed an oblong head with open frontal bones visible (known as a "lemon sign," frequently noted in spina bifida). They contend that the sonogram findings should have prompted an amniocentesis, which, had it been performed, would in all likelihood have diagnosed this fetus's neurotube defect.
As described by the considerable literature and litigation in this area, a "wrongful birth action" refers to a claim for relief by parents who allege they would have avoided conception or would have terminated the pregnancy but for the negligence of those charged with prenatal testing, genetic prognosticating, or counseling parents as to the likelihood of giving birth to a physically or mentally impaired child. The underlying premise is that prudent medical care would have detected the risk of a congenital or hereditary genetic disorder either before conception or during pregnancy. In such an action, the parents allege that as a proximate result of this negligently performed or omitted genetic counseling or prenatal testing they were foreclosed from making an informed decision whether to conceive a potentially handicapped child or, in the event of a pregnancy, to terminate it. See, Trotzig,The Defective Child and the Actions for Wrongful Life andWrongful Birth, 14 Fam.L.Q. 15, 16-17 (1980).
The history of wrongful birth actions and the judicial reasoning behind the development of this area of law is traced in a 1992 law review article:
 "Courts initially resisted recognizing a cause of action for wrongful birth. The early cases befuddled the courts because, unlike traditional malpractice cases, nothing that the health care provider could have done would have prevented the harm to the child. The logic behind these early suits was that if the parents of the affected child had received proper counseling or diagnosis, they could have decided not to conceive or to seek an abortion. Early case law dealing with wrongful birth actions rejected the notion that the failure to warn the parents of a fetus' risk of serious defect was actionable because the physician was not the proximate cause of the defect. However, liability for a missed diagnosis in other areas of medicine was, and still is, common even though, in such cases, the physician did not cause the illness.
 "Another reason that courts were reluctant to recognize the wrongful birth cause of action was that the post-conception remedy available — abortion — was illegal. This reasoning is no longer valid after Roe v. Wade [410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147], which upheld a woman's constitutional right to undergo an abortion during the first two trimesters of pregnancy. As one court noted, '[t]he value of genetic testing programs . . . is based on the opportunity of parents to abort afflicted fetuses, within appropriate time limitations.'
 "Wrongful birth cases are now widely recognized. An action exists when physicians fail to warn prospective parents that they are at risk of conceiving or giving birth to a child with a serious genetic disorder. This potential liability includes instances in which a reasonable physician should have known of the risk because the couple's previous child had a genetic disorder or because of the woman's advanced age. Liability can also arise if the health care provider fails to advise prospective parents of known risks due to one or both parents belonging to a particular ethnic or racial group. Finally, courts find physicians liable for failing to discuss the availability of genetic services when specific risk assessment services are available. Thus, physicians may be liable for failing *Page 1025 
to inform a couple about the availability of carrier status testing (to determine whether the parents' genes harbor a defect which, if passed to the child, could cause a genetic disorder) or prenatal diagnosis (to determine if the fetus is currently affected or will develop the genetic disorder)."
Lori B. Andrews, Torts and the Double Helix: MalpracticeLiability for Failure to Warn of Genetic Risks, 29 Hous.L.Rev. 149, 152-55 (1992). (Footnotes omitted.) The author of this article reviews court decisions and notes the concern that the issue of damages has caused those courts that have recognized the cause of action. She notes that some courts feel that the benefit of having the child should offset any damages award. However, some disagree with this approach. A justice of the Georgia Supreme Court stated his disagreement in this compelling language:
 "More importantly we would not even consider the theory that the joy of parenthood should offset the damages. Would anyone in their right mind suggest that where a healthy fetus is injured during delivery the joy of parenthood should offset the damages? There is no more joy in an abnormal fetus come to full term than a normal fetus permanently injured at delivery. Both are heartbreaking conditions that demand far more psychological and financial resources than those blessed with normal children can imagine."
Atlanta Obstetrics Gynecology Group v. Abelson, 260 Ga. 711,398 S.E.2d 557, 565 (1990) (Smith, J., dissenting).
An action for wrongful birth was first considered inGleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689 (1967). InGleitman, the parents of a rubella syndrome child brought an action against a physician who allegedly had advised them that the mother's contraction of rubella during pregnancy would not affect the fetus. The court rejected the parents' wrongful birth claim for two reasons. The first had to do with the difficulty of measuring damages. In the court's view, in order to determine the amount of the parents' recovery, it would be necessary to evaluate the denial to them of the "intangible, unmeasurable, and complex human benefits of motherhood and fatherhood and weigh these against the alleged emotional and money injuries." The court concluded that this would be impossible. As the second reason, the court said that public policy reflected in the then-existing prohibition against abortion precluded the recovery of damages for denial of an opportunity to abort a fetus.
Since 1967, most courts have rejected the Gleitman court's reasoning, and a majority of the jurisdictions in which the issue has been considered have recognized the cause of action.[2]
This Court has never considered the *Page 1026 
issue, but a United States Circuit Court of Appeals, applying Alabama law, has concluded that, if the Alabama courts were confronted with the issue, Alabama law would compel recognition of the cause of action.
Courts recognizing the cause of action have addressed most of the arguments advanced by the defendants here. They have rejected the argument that it is impossible to measure damages.Blake v. Cruz, 108 Idaho 253, 698 P.2d 315 (1984); Becker v.Schwartz, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807
(1978); Jacobs v. Theimer, 519 S.W.2d 846 (Tex. 1975). It has been said that damages sought in wrongful birth actions are ascertainable and require nothing extraordinary in terms of measurement. Becker, supra; Jacobs, supra. Courts have rejected public policy arguments for refusing to recognize an action for wrongful birth as no longer valid, following the United States Supreme Court's decision holding that the Constitution of the United States guarantees a right to decide whether to terminate a pregnancy in the first two trimesters. Roe v. Wade,410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Referring to the Roe decision, courts have said that failure to recognize a cause of action for wrongful birth would impermissibly infringe on constitutional rights involved in conception, procreation, and other familial decisions. Phillips, supra. Some courts have said that public policy now supports, rather than militates against, the proposition that parents should not be denied the opportunity to terminate a pregnancy. Gildiner v. ThomasJefferson University Hospital, 451 F. Supp. 692 (E.D.Pa. 1978), and Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979), overruled Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689
(1967). Some courts have held that refusal to recognize wrongful birth actions would immunize from liability those persons who fail to provide proper guidance to persons who would otherwise choose to exercise their constitutional right to abort a fetus that, if born, would be seriously unhealthy.Robak v. United States, 658 F.2d 471 (7th Cir. 1981). Recognition of wrongful birth actions is seen by some as encouraging the accurate performance of medical procedures.Gildiner, supra.
The New Jersey Supreme Court in Berman stated:
 "As in all other cases of tortious injury, a physician whose negligence has deprived a mother of this opportunity should be required to make amends for the damage which he has proximately caused. Any other ruling would in effect immunize from liability those in the medical field providing inadequate guidance to persons who would choose to exercise their constitutional right to abort fetuses which, if born, would suffer from genetic defects. See Note, supra, 87 Yale L.J. at 1504-1508; see, e.g., Gildiner, supra, 451 F. Supp. at 696; Dumer, supra, 233 N.W.2d at 376-377; Jacobs v. Theimer, 519 S.W.2d 846, 849 (Tex. 1975)."
80 N.J. at 432, 404 A.2d at 14.
At least one court has taken the position that wrongful birth actions are not new actions, but actually fall within the traditional boundaries of negligence actions. Robak, supra. A cause of action for wrongful birth is, in essence, an action for professional malpractice by a health care provider. Robak, supra. We agree.
"The elements for recovery under a negligence theory are: (1) duty, (2) breach of duty, (3) proximate cause, and (4) injury."Jones v. Newton, 454 So.2d 1345, 1348 (Ala. 1984), citing MascotCoal Co. v. Garrett, 156 Ala. 290, 47 So. 149 (1908). See also,Rutley v. Country Skillet Poultry Co., 549 So.2d 82, 85
(Ala. 1989).
To establish a prima facie case in an action for wrongful birth, it is necessary *Page 1027 
for the plaintiff to plead and prove actual injury. It has been recognized that the birth of a seriously deformed child results in injury to the child's parents. Blake, supra; Naccash v.Burger, 223 Va. 406, 290 S.E.2d 825 (1982), and Harbeson v.Parke-Davis, Inc., 98 Wn.2d 460, 656 P.2d 483 (1983). This conclusion is inevitable if it is also recognized that parents have a right to terminate a pregnancy. Roe v. Wade holds not only that parents do have such a right, but that it is one guaranteed to them against most state action by the Constitution of the United States. Harbeson, supra.
The plaintiff must also prove a causal connection between the defendant's negligence and the child's birth. In order to establish causation, it is necessary for the plaintiff to show that, had the defendant not been negligent, the plaintiff would have been aware of the possibility that the child would be seriously defective, and either the child would not have been conceived or the pregnancy would have been terminated.Blake, supra; Eisbrenner v. Stanley, 106 Mich. App. 357,308 N.W.2d 209 (1981); Jacobs, supra; and Dumer v. St. Michael'sHospital, 69 Wis.2d 766, 233 N.W.2d 372 (1975).
A claim for medical negligence is recognized in Alabama, but a claim for wrongful birth has not been specifically addressed by this Court. The plaintiffs correctly point out that we have referred to the wrongful birth cause of action on three occasions. First, in Elliott v. Brown, 361 So.2d 546
(Ala. 1978), we were faced with a wrongful life claim by a child born with serious deformities; the child's father had remained fertile after a negligently performed vasectomy. We held that a child does not have an action for wrongful life. We said that "there is no legal right not to be born," 361 So.2d at 548, and, therefore, that no cause of action exists for wrongful life:
 "Upon what legal foundation is the court to determine that it is better not to have born than to be born with deformities? . . . We decline to pronounce judgment in the imponderable area of nonexistence."
361 So.2d at 548. In Elliott, we noted that "[o]nly the [child's] suit was dismissed [by the trial court]. The suits by Therman Elliott and his wife [for wrongful birth] are in no way involved [in] this appeal." In Elliott, we relied on the reasoning of Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689
(1967), which has been partially reversed to permit a wrongful birth claim.
Second, in Boone v. Mullendore, 416 So.2d 718 (Ala. 1982), the plaintiff alleged that her doctor had negligently failed to remove her fallopian tubes or had negligently represented that her fallopian tubes had been removed and that she was sterile. The plaintiff subsequently conceived and gave birth to a healthy child. We stated that this claim for wrongfulpregnancy, unlike a claim for wrongful life, is more suited to a traditional medical malpractice action. We applied a traditional tort analysis of duty, breach of duty, proximate cause, and damage. We recognized a case of action for wrongful pregnancy in Boone. Third, in Colburn v. Wilson,570 So.2d 652 (Ala. 1990), the parents made a wrongful birth claim against a physician for failing to detect gross abnormalities by ultrasound. The facts of Colburn are similar to those of this case. However, we did not address the merits of the wrongfulbirth claim because, "assum[ing] that there was a cause of action," the claim was barred by the statute of limitations.570 So.2d at 654.
Dr. Banach urges us to follow the reasoning in Azzolino v.Dingfelder, 315 N.C. 103, 337 S.E.2d 528 (1985). The North Carolina court held: "claims for relief for wrongful birth of defective children shall not be recognized in this jurisdiction absent a clear mandate from the legislature." 315 N.C. at 110,337 S.E.2d at 533. The North Carolina court concluded that a claim for wrongful birth did not fit within the framework of a traditional tort analysis and reasoned that a breakdown occurs when the analysis reaches the issues of proximate cause and injury:
 "In order to allow recovery such courts must then take a step into entirely untraditional analysis by holding that the existence of a human life can constitute an injury cognizable at law. Far from being 'traditional' tort analysis, such a step requires a view of human life previously unknown to the law of this jurisdiction. We are unwilling to take any such step because *Page 1028 
we are unwilling to say that life, even life with severe defects, may ever amount to legal injury."
315 N.C. at 111, 337 S.E.2d at 533-34. According to the court in Azzolino, the heart of the problem in wrongful birth cases is that the "physician cannot be said to have caused the defect. This disorder is genetic and not the result of any injury negligently inflicted by the doctor." 315 N.C. at 115,337 S.E.2d at 536, quoting Becker v. Schwartz, 46 N.Y.2d 401 at 417-22, 413 N.Y.S.2d 895 at 904-07, 386 N.E.2d 807 at 816-19 (1978) (Wachtler, J., dissenting in part).
In Robak, where the action was brought under the Federal Tort Claims Act, the Government advanced a similar argument: that no proximate cause existed because irrevocable injury to the fetus had already occurred before the negligent acts were committed. The Seventh Circuit Court of Appeals, applying Alabama law, responded:
 "A negligent act need not be the sole cause of the injury complained of in order to be a proximate cause of that injury. Moreover, the cause of action is not based on the injuries to the fetus but on defendant's failure to diagnose . . . and inform . . . of the consequences."
658 F.2d at 477. We agree that the analysis set out in Robak comports with Alabama law. See, e.g., Wolfe v. Isbell, 291 Ala. 327, 280 So.2d 758, 761 (1973). We also agree with the Robak
court that a so-called wrongful birth case is in reality a medical negligence malpractice case. That court said: "A case like this one is little different from an ordinary medical malpractice action. It involves a failure by a physician to meet a required standard of care, which resulted in specific damages to the plaintiffs." Robak at 476. This case involves an alleged failure by Dr. Banach to properly perform prenatal tests that would have revealed severe multiple congenital abnormalities in the fetus, which, if known to the parents, would have weighed in their decision whether to exercise their constitutional right to terminate the pregnancy.
The defendants make compelling policy arguments for rejecting the plaintiffs' cause of action. These include:
 "(1) [T]he tort will be particularly subject to fraudulent claims. The cause of action is dependent entirely upon the retrospective and subjective testimony of the mother that had she known of the defects during the pregnancy, she would have aborted the child.
 "(2) [T]he wrongful birth action would place a heavy burden on obstetricians/gynecologists. Appellee claims that with respect to obstetrics and gynecology the wrongful birth action will:
"a. Increase abortions;
 "b. Increase abortions of healthy fetuses as a risk management action;
 "c. Increase the cost of prenatal care as the result of more prenatal testing and the burden on OB/GYNs to obtain detailed informed consent; and
 "d. Lead to the reduction of OB/GYNs practicing in the state.
 "(3) Another concern is that which was recognized in Boone, which is the negative impact the cause of action may have on the child by creating an 'emotional bastard.'
 "(4) Since the wrongful birth views nonexistence as being greater than life with a disability, the cause of action would have a negative impact on the disabled. The cause of action cries out that children with disabilities constitute injury to parents. This will lead to a stigmatism and high toll on the self-esteem of persons with disabilities at a time when our state and country are moving forward at great lengths to recognize the rights and privileges of the disabled as ordinary citizens."
These same arguments were advanced in Siemieniec v. LutheranGen. Hosp., 117 Ill.2d 230, 111 Ill.Dec. 302, 512 N.E.2d 691
(1987). The Supreme Court of Illinois rejected those arguments and stated:
 "In a negligence medical malpractice case, the burden is on the plaintiff to prove the following elements of a cause of action: the proper standard of care against which the defendant physician's conduct is measured; an unskilled or negligent failure to comply with the applicable standard; and a resulting injury proximately caused by the physician's want of skill or care. (Purtill v. *Page 1029 Hess (1986), 111 Ill.2d 229, 241-42, 95 Ill.Dec. 305, 489 N.E.2d 867; Walski v. Tiesenga (1978), 72 Ill.2d 249, 256, 21 Ill.Dec. 201, 381 N.E.2d 279; Borowski v. Von Solbrig (1975), 60 Ill.2d 418, 423, 328 N.E.2d 301.) . . . The parent's claim for wrongful birth rests upon the injury to the mother by virtue of the physician's or other health care provider's negligence, resulting in the mother's being deprived of the right to make an informed choice either to prevent the child's conception or to terminate the child's life by abortion. Thus the defendant argues that in wrongful birth cases the injury complained of is life itself. In either case, however, in order to support such a claim this court would have to conclude that life, even with severe defects, can be an injury. . . ."
117 Ill.2d at 254, 111 Ill.Dec. at 314, 512 N.E.2d at 703-04.
Although the arguments of the defendants set out above are compelling, the great weight of authority to the contrary forces us to agree with the majority of the courts and the legal commentators and to hold that an action for the wrongful birth of a genetically or congenitally defective child may be maintained by the parents of such a child.
The nature of the tort of wrongful birth has nothing to do with whether a defendant caused the injury or harm to the child, but, rather, with whether the defendant's negligence was the proximate cause of the parents' being deprived of the option of avoiding a conception or, in the case of pregnancy, making an informed and meaningful decision either to terminate the pregnancy or to give birth to a potentially defective child. Like most of the other courts that have considered this cause of action, we hold that the parents of a genetically or congenitally defective child may maintain an action for its wrongful birth if the birth was the result of the negligent failure of the attending prenatal physician to discover and inform them of the existence of fetal defects.
We next consider the issue of damages. The Keels urge us to allow them to pursue damages for (1) Justin's medical expenses, (2) the cost of Justin's medical equipment (such as his wheelchair), (3) the value of Karen's services in nursing and caring for Justin to the exclusion of her work or career, (4) Danny's loss of consortium of Karen attendant with the cesarean section birth, (5) Karen's physical pain and suffering associated with the cesarean section delivery of Justin due to the hydrocephalus, (6) and the tremendous emotional suffering and mental anguish associated with day-to-day life with Justin which, they claim, are natural and foreseeable consequences of the injury they sustained.
Damage or harm incurred by the Keels for which they do not make a claim are: (1) the ordinary expenses of raising and providing for Justin, such as food, clothing, shelter, books, and toys, (2) costs associated with taking Justin to a public school in a nearby town, and (3) the expenses relating to Justin's funeral.
Damages not incurred by the Keels, but which they urge us to adopt as recoverable damages in a cause of action for wrongful birth are: (1) missed work and salary cuts, (2) future medical expenses, and (3) special educational costs.
Among the jurisdictions that recognize the cause of action for wrongful birth, there is little agreement on the issue of damages, and a majority does not allow recovery for emotional distress. In Robak v. United States, 658 F.2d 471 (7th Cir. 1981), the Seventh Circuit Court of Appeals allowed recovery for all damage related to the doctor's negligence, including the costs associated with rearing a normal child. InLloyd v. North Broward Hospital District, 570 So.2d 984 (Fla. Dist. Ct. App. 1990), opinion partly quashed by Kush v. Lloyd,616 So.2d 415 (Fla. 1992), the court held that, in a wrongful birth action, emotional distress is a natural consequence of the tort and is properly seen as an additional element of damage incident to the wrongful birth claim.
The basic rule of tort compensation is that the plaintiff should be put in the position that he would have been in absent the defendant's negligence. Robak concluded "that the case [was] governed by ordinary tort principles. It is a fundamental tenet of tort law that a negligent tortfeasor is liable for all *Page 1030 
damages that are the proximate result of his negligence."658 F.2d at 478 (emphasis original). Alabama has followed this rule in other medical negligence malpractice actions. Snow v. Allen,227 Ala. 615, 151 So. 468 (1933).
We follow the holding of other courts that have considered this issue. "[T]he current trend with respect to damages is to allow the recovery of only the additional costs of treatment and special resources for the child, not the entire cost of rearing the child." Andrews, The Double Helix, supra, at 156-57. This article notes that one state has codified this rule of damages. Maine has adopted a statute that provides: "Damages for the birth of an unhealthy child born as the result of professional negligence shall be limited to damages associated with the disease, defect or handicap suffered by the child." The primary element of damages that may be recovered in an action for wrongful birth is the pecuniary loss to the plaintiffs, the child's parents, resulting from the care and treatment of the child. The plaintiffs are entitled to recover for the extraordinary expenses they incur because of the child's unhealthy condition, including: (1) hospital and medical costs, (2) costs of medication, and (3) costs of education and therapy for the child.
It is generally recognized that, in a wrongful birth action, parents may recover the extraordinary costs necessary to treat the birth defect and any additional medical or educational costs attributable to the birth defect during the child's minority. See Turpin v. Sortini, 31 Cal.3d 220, 182 Cal.Rptr. 337,643 P.2d 954 (1982); Ramey v. Fassoulas, 414 So.2d 198
(Fla.Dist.Ct.App. 1982); Blake v. Cruz, 108 Idaho 253,698 P.2d 315 (1984); Schroeder v. Perkel, 87 N.J. 53, 432 A.2d 834
(1981); Becker v. Schwartz, 46 N.Y.2d 401, 413 N.Y.S.2d 895,386 N.E.2d 807 (1978); Jacobs v. Theimer, 519 S.W.2d 846
(Tex. 1975); Naccash v. Burger, 223 Va. 406, 290 S.E.2d 825
(1982); Harbeson v. Parke-Davis, Inc., 98 Wn.2d 460,656 P.2d 483 (1983), later proceeding, 746 F.2d 517 (9th Cir. 1984);Dumer v. St. Michael's Hosp., 69 Wis.2d 766, 233 N.W.2d 372
(1975).
Emotional distress suffered by the parents of an unhealthy child is compensable in a wrongful birth action. See,Phillips v. United States, 508 F. Supp. 544 (D.S.C. 1981);Blake, supra; Eisbrenner v. Stanley, 106 Mich. App. 357,308 N.W.2d 209 (1981); Naccash, supra; and Harbeson, supra. A jury could conclude that the defendants, in failing to inform Mrs. Keel of the possibility of giving birth to a child with severe multiple congenital abnormalities, directly deprived her and, derivatively, her husband, of the option to accept or reject a parental relationship with the child and thus caused them to experience mental and emotional anguish upon their realization that they had given birth to a child afflicted with severe multiple congenital abnormalities.
We conclude that the following items are compensable, if proven: (1) any medical and hospital expenses incurred as a result of a physician's negligence; (2) the physical pain suffered by the wife; (3) loss of consortium; and (4) mental and emotional anguish the parents have suffered.
We agree with the Supreme Court of Illinois in Siemieniec v.Lutheran Gen. Hosp., supra, that the issue presented by litigation like this is one properly to be resolved by the courts. That court said:
 "Many courts have accepted wrongful birth as a cause of action on the theory that it is a logical and necessary extension of existing principles of tort law. (E.g., Eisbrenner v. Stanley (1981) 106 Mich. App. 357, 366-67, 308 N.W.2d 209, 213; Schroeder v. Perkel (1981), 87 N.J. 53, 62, 432 A.2d 834, 838; Becker v. Schwartz (1978), 46 N.Y.2d 401, 412-13, 413 N.Y.S.2d 895, 901, 386 N.E.2d 807, 813; Naccash v. Burger (Va. 1982), 223 Va. 406, 290 S.E.2d 825, 829; Harbeson v. Parke-Davis, Inc.
(1983), 98 Wn.2d 460, 466-67, 656 P.2d 483, 488; James G. v. Caserta (W.Va. 1985) [175 W. Va. 406], 332 S.E.2d 872, 882). Some courts have recognized the cause of action because of the expanding ability of medical technology to accurately detect and predict genetic or other congenital abnormalities before conception or birth. Imposing liability on individual physicians or other health-care providers, these courts say, vindicates the societal interest in reducing and preventing the incidence of such defects. *Page 1031 
(E.g., Blake v. Cruz (1984), 108 Idaho 253, 256, 698 P.2d 315, 318.) Other courts have expressed concern that refusing to recognize this cause of action would frustrate the fundamental policies of tort law: to compensate the victim; to deter negligence; and to encourage due care. (E.g., Robak v. United States (7th Cir. 1981), 658 F.2d 471, 476
(applying Alabama law); Phillips v. United States
(D.S.C. 1981), 508 F. Supp. 544, 550 (applying South Carolina law); Gildiner v. Thomas Jefferson University Hospital (E.D.Pa. 1978), 451 F. Supp. 692, 696 (applying Pennsylvania law); Smith v. Cote
(1986), 128 N.H. 231, 242, 513 A.2d 341, 348.) A few courts have also stated that refusal to recognize wrongful birth claims would impermissibly burden the constitutional rights involved in conception, procreation, and other familial decisions. E.g., Speck v. Finegold (1981), 497 Pa. 77, 84-85, 439 A.2d 110, 114; Jacobs v. Theimer
(Tex. 1975), 519 S.W.2d 846, 848."
117 Ill.2d at 257-58, 111 Ill.Dec. at 316, 512 N.E.2d at 705.
The Alabama legislature passed a new Medical Liability Act in 1987, regarding medical negligence causes of action. Nowhere in that Act are wrongful birth cases excluded, as they are in laws passed in Missouri and Minnesota. We can only assume that the Alabama legislature did not intend to exclude this class of negligence cases from resolution by the courts.
For the foregoing reasons, the judgment of the trial court holding that the Keels have no cause of action for wrongful birth is reversed and the cause is remanded for proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and ALMON, ADAMS, HOUSTON and INGRAM, JJ., concur.
[1] Hydrocephaly is a condition commonly seen in children with neural tube defects or spina bifida.
[2] Courts that have considered the issue are listed:
ALABAMA Robak v. United States, 658 F.2d 471 (7th Cir. 1981) (Alabama law).
FLORIDA Moores v. Lucas, 405 So.2d 1022
(Fla.Dist.Ct.App. 1981).
IDAHO Blake v. Cruz, 108 Idaho 253, 698 P.2d 315 (1984).
ILLINOIS Goldberg v. Ruskin, 128 Ill. App.3d 1029, 84 Ill.Dec. 1, 471 N.E.2d 530 (1984).
KANSAS Arche v. United States Dep't of the Army, 247 Kan. 276, 798 P.2d 477 (1990).
LOUISIANA Pitre v. Opelousas General Hospital, 530 So.2d 1151
(La. 1988).
MICHIGAN Eisbrenner v. Stanley, 106 Mich. App. 357, 308 N.W.2d 209 (1981).
MASSACHUSETTS Viccaro v. Milunsky, 406 Mass. 777, 551 N.E.2d 8
(1990).
MISSOURI Shelton v. Saint Anthony's Medical Center, 781 S.W.2d 48 (Mo. 1989).
NEW HAMPSHIRE
Smith v. Cote, 128 N.H. 231, 513 A.2d 341 (1986).
NEW JERSEY Schroeder v. Perkel, 87 N.J. 53, 432 A.2d 834
(1981); Berman v. Allan, 80 N.J. 421, 404 A.2d 8 (1979), overruling Gleitman v. Cosgrove, 49 N.J. 22, 227 A.2d 689
(1967).
NEW YORK Becker v. Schwartz, 46 N.Y.2d 401, 413 N.Y.S.2d 895, 386 N.E.2d 807 (1978).
PENNSYLVANIA Gildiner v. Thomas Jefferson University Hospital, 451 F. Supp. 692 (E.D.Pa. 1978). Speck v. Finegold, 497 Pa. 77, 439 A.2d 110 (1981).
SOUTH CAROLINA Phillips v. United States, 508 F. Supp. 544
(D.S.C. 1981), later proceeding, 566 F. Supp. 1 (D.S.C. 1981), later proceeding, 575 F. Supp. 1309 (D.S.C. 1983).
TEXAS Nelson v. Krusen, 678 S.W.2d 918 (Tex. 1984); Jacobs v. Theimer, 519 S.W.2d 846 (Tex. 1975).
VIRGINIA Naccash v. Burger, 223 Va. 406, 290 S.E.2d 825
(1982).
WASHINGTON Harbeson v. Parke-Davis, Inc., 98 Wn.2d 460, 656 P.2d 483 (1983).
WEST VIRGINIA James G. v. Caserta, 175 W. Va. 406, 332 S.E.2d 872 (1985).
WISCONSIN Dumer v. St. Michael's Hospital, 69 Wis.2d 766, 233 N.W.2d 372 (1975).