**Claire Abigail BASTEN, By and Through her next friend, Jonathan A. BASTEN; Jonathan A. Basten; Kathie J. Basten, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 92–H–1417–N.**

United States District Court, M.D. Alabama, N.D.

March 21, 1994.

Pittman, Hooks, Marsh, Dutton & Hollis, Tom Dutton, Birmingham, AL, for plaintiffs.

David L. Allred, Asst. U.S. Atty., Montgomery, AL, for defendant.

## MEMORANDUM OPINION

HOBBS, District Judge.

The plaintiffs, Kathie J. Basten, Jonathan A. Basten, and Claire Abigail Basten, have brought this action against the United States of America, pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2678. This is a negligence action in which plaintiffs allege that the United States breached the standard of care governing the administration of fetal testing and genetic screening and is therefore responsible for all damages proximately flowing from this breach. Jurisdiction over this action, which was tried without a jury on January 24–25, 1994, is predicated on 28 U.S.C. § 1346(b).

The legal theories governing this case arise out of painful and difficult circumstances. Although the circumstances giving rise to this case touch upon the more vexing moral dilemmas of our time, today's decision breaks no new ground; rather it stems solely from the currently entrenched legal doctrine governing actions for wrongful birth. *See Keel v. Banach*, 624 So.2d 1022 (Ala.1993). Having applied the dictates of *Keel* to the facts presently before the court, the court concludes that judgment is due to be rendered in favor of plaintiffs.

## I. BACKGROUND

Neural tube defects constitute a significant class of commonly occurring congenital malformations. A neural tube defect results from an abnormality of the skull and spinal canal, occurs during the first few weeks of pregnancy, and produces a wide range of problems relating to the brain and spinal cord. There are three types of a common and serious neural tube defect known as spina bifida, with the most serious type known as spina bifida myelomeningocele. This occurs when the spinal cord, nerve roots, and a sac containing spinal fluid protrudes through an opening in the spinal column.

Depending on the severity of the defect and how high on the spinal column the defect occurs, persons born with spina bifida may have paralyzed limbs, no control of bladder or bowel function, and a life-threatening disorder of the drainage of spinal fluid from the brain, known as hydrocephalus. Spina bifida may or may not be consistent with long-term survival.

Most neural tube defects can be reliably detected by performing a simple virtually risk free screening test which measures the amount of maternal serum alpha-fetoprotein (MSAF or AFP), a substance produced by the growing fetus. The test requires no more than obtaining a blood sample from the mother, but for clinical and practical purposes, it must be administered within a narrow time frame during pregnancy (sixteen-twenty weeks). A fetus with a neural tube defect produces abnormally large amounts of AFP, which may be measured by taking a sample of the mother's blood. If the test indicates the possibility of a neural tube defect (NTD), it is repeated, and if still positive, other tests are done to confirm or refute the findings.

The AFP test is recommended even for women who would refuse to have an abortion, for in the event a defect is discovered, the doctor will know to make special preparations for the child's delivery or it will alert the doctor to the child's need for highly specialized care at another facility. Moreover, even if no AFP test is performed during the 16–20 week window of opportunity, some of the more severe instances of abnormality may be detected by using high resolution sonography.

AFP testing is highly reliable, inexpensive, and nonintrusive. When a neural tube defect is detected during an appropriate time during pregnancy, the fetus is aborted 90 percent of the time. By late 1986, the parties have stipulated that the offering of AFP testing, and the documentation of the acceptance or rejection of such offer, was an accepted part of the national standard of care. During the time of Kathie Basten's pregnancy with Molly in 1988, AFP testing could only be offered and documented during a four-week window of opportunity which spanned from the sixteenth to the twentieth weeks of pregnancy.

## II. *FACTUAL FINDINGS*

Kathie Basten became pregnant during the summer of 1988, while she was taking oral contraceptives. Dissatisfied with the care she was provided during her 1986 pregnancy with Abbie, her first child, Kathie Basten sought permission to obtain off-base care. Because her request was denied, she again attended the on-base clinic at Maxwell. After her pregnancy was confirmed, she obtained an appointment to begin obstetrical care at Maxwell.

On August 2, 1988, Kathie attended an orientation meeting for newly pregnant women which was held every other week at the library of the medical clinic at Maxwell. The meeting was attended by thirteen pregnant women and a few of their husbands, lasted for one and a half hours or two hours, and was conducted (at least in part) by Major Altringer, a nurse/midwife. During the meeting, the women were provided with various pre-assembled written materials, some of which constituted information packets and some of which constituted records to be completed for the medical chart. Kathie recalls no information on AFP testing being included in the packets she received. Kathie gave urine and blood samples for several screening tests, listened to various speakers, and made numerous entries in her medical chart. Part of the information Ms. Basten entered on her chart was that she had recently taken oral contraceptives.

Standard Maxwell policy required that the mother's chart contain a form explaining AFP testing and including a place for the mother to indicate her acceptance or refusal of such test. A one-page brochure on AFP testing was also customarily clipped to the form in the chart; however, Kathie's chart never contained either the form or the brochure. The women who attended the conference were told, as a group, that AFP was an optional test which would assay for birth defects and which the patient would discuss later with the health care provider. Both Ms. Basten and Ms. Jakel (another woman in attendance) testified that no one was informed that the burden to request AFP testing resided with the patient. No one was informed that she should identify the appropriate time within which to contact the hospital so that an appointment could be secured during the sixteen-twenty week window.

Kathie Basten was familiar with AFP testing only in the most general of terms. She knew nothing of the sixteen-twenty week

window, knew nothing of the necessity for identifying that window, and knew nothing of her purported responsibility to initiate discussion on AFP testing. Although Maxwell health providers enjoyed numerous opportunities to discuss AFP testing with Kathie, the subject was never again mentioned until after the sixteen to twenty week window had closed. At no time did Kathie Basten refuse an offer for AFP testing; at no time was she told she had to request the test; and at no time did she know that the test had to occur during the sixteen to twenty week interval.

Following the orientation session, Kathie Basten next visited the clinic on August 12, 1988, whereupon she was attended by Major Altringer. This was a regularly scheduled appointment which occurred prior to the sixteenth week of Kathie's pregnancy. The medical chart contains no entry concerning AFP testing, although several notations were entered in the chart on that date. AFP testing was not mentioned during this visit.

On August 17, 1988, Kathie Basten received an ultrasound at the clinic. The purpose of the ultrasound was to confirm gestational age. Nothing about AFP testing was mentioned during this visit.

During the last few days in August until about September 7, 1988, Kathie was in Ohio, visiting her husband's family. Upon returning to Alabama, she called the clinic for an appointment, seeking to obtain the appointment before September 13, 1988, when she planned to visit her family in South Carolina. She was told that she could not obtain an appointment that week but that she could call again when she returned. When she returned from South Carolina on September 20 or 22, she called the clinic and received what was allegedly the first available appointment, on October 4, 1988. Although both phone calls were made within the sixteen to twenty week window, and although there was no evidence in Kathie's chart to indicate she had refused AFP testing, AFP testing was not mentioned to her.

On October 4, Kathie and her husband went to the clinic together. He remained with her throughout the visit. The October 4 date occurred after the window for AFP testing had closed, and pursuant to Maxwell policy, AFP was not mentioned to either Kathie or Jonathan. In addition, Major Altringer (again the attending health care specialist) made no record in Kathie's chart of any offer of AFP testing. AFP testing simply was not discussed during this visit, or on any subsequent visit, during which time Kathie was attended by various nurse/midwives, but never by a physician.

The next pertinent visit was December 19, 1988. At that time, Kathie had a four and one-half pound weight gain in two weeks, and had been sick with nausea and vomiting. A decision was then made to schedule another ultrasound. It was scheduled for January 5, 1989, and on that date Kathie and her husband went to the radiology clinic for an ultrasound. After the ultrasound was performed, the Bastens were instructed to wait.

They waited in the hall until they were taken to Dr. Kim Whittington's office. Sitting in the office with the door open, the Bastens were told of the neural tube defect. Kathie became extremely upset, and her husband tried to comfort her. During the meeting, Kathie Basten stated that she probably would not have terminated the pregnancy had she known of the problem earlier. Kathie stated either that she did not know the AFP test was necessary, or she did not know it was important. At no time during this meeting did Kathie admit that she had been offered, or that she had refused, AFP testing.

Subsequently, arrangements were made for the Bastens to travel to Keesler Air Force Base in Biloxi, Mississippi, where they were supposed to receive special care for the delivery of the baby. Molly Basten was born on February 2, 1989, by a caesarean section.

Molly Basten was born with the most serious type of spinal column defect, spina bifida myelomeningocele. She had a bony defect in her vertebral column on her back a little above the navel. Through this defect protruded a malformed meninges (the membranous covering which contains the spinal cord and spinal fluid), and malformed spinal cord. Operations were proposed to reduce (make smaller) the defects in the spinal column and cord, and to place a shunt in the child's brain

in order that spinal fluid could be drained from the brain, thereby reducing life-threatening intracranial pressure.

The medical consensus was that Molly's chances for long-term survival were zero without corrective surgery. The consensus was also that with corrective surgery, assuming Molly survived it, she would probably be mentally retarded, paraplegic (having paralysis of her lower extremities), incontinent (of both bowel and bladder), and hydrocephalic (having an inability to adequately drain spinal fluid from the brain and requiring a mechanical shunt to drain it), and she would probably have a normal life expectancy.

The Bastens refused to consent to subjecting Molly to these procedures. After the United States received a court order overriding the Bastens' wishes, the surgeries were undertaken and Molly's life was saved. Molly is now five years of age and she has a normal life expectancy of approximately seventy-six years. The presurgical prognostications about Molly's post-surgical fate were, in many respects, accurate. She is paraplegic. She is incontinent. She is hydrocephalic. She does have a normal life expectancy. Unlike predicted, Molly has a good intellect and a pleasing personality. Her problems are permanent ones.

Molly has also been forced to undergo additional neurosurgery, a revision of the shunt. Neurosurgery to revise the shunt again is likely to be necessary several more times during her life.

In addition to being incontinent of bladder and bowel, Molly has experienced and will continue to experience related kidney, ureter, and bladder problems. Because of these problems, Molly underwent an operation called a cutaneous vesicotomy. It created a channel from the bladder and through the skin so that the bladder now drains that way instead of normally. She also requires intermittent mechanical bladder emptying (catheterization) and diapers. These problems and requirements are also permanent ones.

III. *DISCUSSION*

A. Liability

The law of the forum state provides the law of liability in FTCA cases. 28 U.S.C. §§ 1346(b), 2674; *Bettis v. United States,* 635 F.2d 1144, 1147 (5th Cir.1981). Accordingly, this court relies upon the Alabama law applicable to this matter.

The Supreme Court of Alabama has recognized a cause of action for wrongful birth. *Keel v. Banach,* 624 So.2d 1022 (Ala. 1993). The elements comprising the tort are the traditional elements of negligence: (1) duty (2) breach (3) proximate cause, and (4) injury. The United States denies that it breached its duty or that it proximately caused plaintiff's injuries.[1]

B. The Standard of Care

1. Offer and Documentation of AFP Testing

In May 1985, the American College of Obstetricians and Gynecologists (ACOG) stated that it is "imperative that every prenatal patient be advised of the availability of [the AFP] test and that [the physician's] discussion about the test and the patient's decision with respect to the test be documented in the patient's chart." In June 1988, ACOG stated that pregnant women should "be made aware of the availability of MSAFP screening" and that "the [t]esting should proceed in accordance with the [1986] guidelines." DEX 6. The 1986 guidelines required that AFP testing be "offered to patients who desire it." DEX 5, p. 4. Both plaintiffs' and defendant's expert doctors agreed that the standard of care, by the time Kathie Basten became pregnant with Molly, required the offering of AFP testing and documentation of the acceptance or rejection of such offer. The *Joint Stipulation* of the parties provided that the standard of care required that "AFP testing be offered and documented between the 16th and 20th weeks of pregnancy." The Government stipulated that it failed to secure the documenta-

---

1. The United States has withdrawn its defense of assumption of risk, which in any event, is fore-

closed by the pretrial joint stipulation.

tion which it was required to obtain in discharging its duty to obtain such documentation.[2]

There is no dispute that AFP testing was not offered to Kathie Basten during the sixteenth and twentieth weeks of pregnancy. During this time frame, Kathie Basten twice phoned the Air Force clinic in hopes of receiving an appointment. On neither occasion did the clinic staff mention that the window for performing AFP testing had begun, despite the fact that Kathie's chart contained no documentation of a refusal to take the AFP test. Although Dr. Whittington testified that there would have been no problem seeing Kathie Basten during the window, the clinic staff failed to schedule her appointment until *after* the window had closed.

It is just as clear that no offer for AFP testing was made to Kathie Basten after the window closed. Major Altringer's testimony to the contrary is simply not credible. By October 4, it was too late for Maxwell to perform an AFP test, and Altringer's obtaining permission to perform one would have been futile. In addition, it was Altringer's practice not to mention AFP testing unless the patient brought it up first.[3] Altringer's testimony that Basten previously (on August 12) refused an AFP test, if believed, would indicate that Altringer's sole justification for inquiring into AFP testing on October 4 was to record Basten's decision in the chart. Yet no such entry was made at the time of the October 4 visit, or at any time thereafter.

Moreover, the affidavit Altringer filled out on March 28, 1989, concerning the October 4,

1988 visit, is rife with inconsistencies. The affidavit repeatedly refers to Kathie Basten as an OB nurse, and indicates Basten told Altringer she was an OB nurse. In reality, Kathie only told Altringer that she had taken some nursing courses, which she dropped when she became pregnant. The affidavit also reflects Altringer's belief that Kathie Basten had taken a trip to Panama. It was Kathie's husband, not Kathie, who had been to Panama. These misunderstandings highlight the unreliability of Altringer's testimony. Most importantly, the court finds that AFP testing was not discussed at the October 4 meeting.

The court also finds that AFP testing was not discussed at the August 12 meeting. Although Altringer testified that she offered AFP testing on that date, during her deposition she stated that she only recalled what was recorded in the chart. As stated before, no documentation of a refusal to consent to AFP testing was ever made part of the chart. Altringer's asserted recollection of making an AFP offer to Basten is even more dubious in light of her seeing three to four hundred patients per month during this time frame. This hectic schedule, coupled with Altringer's general confusion surrounding the realities of Kathie Basten's pregnancy (as well as the failure to document AFP refusal at any juncture), compels this court to disregard Altringer's testimony where it conflicts with Kathie Basten's.[4] In addition, Dr. Klaven testified that in his vast experience it was highly unusual for AFP testing to be rejected. He could imagine no reason why a wom-

---

2. The Government admits that it departed from the standard of care by not obtaining documentation of the alleged declination of the test by Kathie Basten. If the Government's contention is accurate and Kathie Basten refused an AFP test, then the Government's failure to document this declination is the principal reason that this case is in court. One of the primary purposes for documenting the refusal to take the test is to remove as an issue whether the woman refused the test. The Government's failure to obtain such documentation buttresses this court's belief that the test was never offered and was never refused. Such failure being the failure of the Government, the court is reluctant to use it as the vehicle on disputed evidence for resolving such dispute in favor of the Government.

3. Dr. Klaven testified placing the onus of discussing AFP testing on the patient violates the standard of care in two respects. First, the health provider should be responsible for bringing up AFP testing. Second, the provider has a duty to convey with conviction the importance of taking an AFP test. The number of refusals (30 percent) at Maxwell indicates the information was insufficient.

4. It is true that during the August 12 visit, Kathie Basten was told to schedule an appointment in four weeks. She was not told that she needed to do this in order to insure that AFP testing could be done during the 16–20 week window. Although Kathie did attempt to obtain an appointment as she was instructed to do, the clinic refused to see her.

an who consented to every offered blood test, and who had previously undergone a voluntary abortion, would refuse a simple AFP test. Such a refusal by Kathie Basten is implausible to this court.

The question thus remains whether the information provided to Kathie Basten at the orientation meeting was sufficient to satisfy the standard of care. Both Kathie Basten and Debra Jakel, who was called as a witness by the Government, testified that no one told them during the orientation that the patient retained responsibility for requesting and scheduling the AFP test. Debra Jakel testified that during both of her pregnancies in which AFP testing was offered, health care providers brought up the test at the appropriate time. Moreover, Kathie Basten recalls that AFP testing was mentioned at the orientation in only the most cursory fashion; Altringer has no specific recollection of that meeting but says her practice was to inform patients to request AFP if they wanted the testing done. Although this practice would most certainly violate the standard of care, it is doubtful that such an instruction was ever given.

Both Dr. Klaven and Dr. Whittington testified that in the absence of a refusal, AFP testing should have been discussed with the patient during the 16–20 week window. Dr. Whittington stated that if a patient showed up during weeks 16–20 and no information appeared on her chart regarding AFP testing, if AFP testing was not discussed at that time, the standard of care would not have been met. Tr. at 13–14; 32.

The sparse information provided to Kathie at the orientation can not qualify as information sufficient to satisfy the requirement that AFP be discussed with the patient. The court finds that Kathie was not instructed that she was to notify the clinic in case she desired AFP testing, nor was she expected to identify the window within which the testing could be done. Had she been given such instructions, this too would have violated the standard of care.

**2. Standard of Care Regarding Oral Contraceptives**

■ The standard of care was violated in another respect as well. Kathie Basten's chart indicated that she had been taking oral contraceptives during the early stages of her pregnancy. Dr. Klaven testified that upon discovery of this fact, Kathie should have been referred to a physician, who then should have referred Kathie to a genetic testing center. Dr. Whittington disputed that genetic testing was required in such a case.

The United States introduced several, nontechnical articles at trial which indicated that the causal nexus between taking oral contraceptives during pregnancy and the subsequent manifestation of birth defects has yet to be confirmed. It is clear, however, that research continues along these lines. It is also clear, as Dr. Klaven pointed out, that a typical "black box" warning accompanying the description of oral contraceptives in the *Physician's Desk Reference (PDR)* for 1988 would state: "The use of oral contraceptives is associated with increased risk of several serious conditions including ... fetal abnormalities." *PDR* at 2093 (1988 42nd edition) (describing Tri–Norinyl). An additional admonition concerning the use of birth control pills was commonplace: "The safety of this product during pregnancy has not been demonstrated. Pregnancy should be ruled out before initiating or continuing the contraceptive regimen.... If pregnancy is confirmed, the patient should be apprised of the potential risks to the fetus, *and the advisability of continuation of the pregnancy should be discussed in light of these risks.*" *PDR* at 1984 (42nd ed. 1988) (describing Demulen) (emphasis added).[5] Likewise, *Drug: Facts and Comparisons 1994* states: "If pregnancy is confirmed, apprise the patient of the potential risks to the fetus, and discuss the advisability of continuing the pregnancy in light of these risks.... Although there is no evidence at the present time that OC's further

---

5. Current editions of PDR have retreated somewhat from this position. Although current editions do assert that "contraceptive use should be discontinued if pregnancy is confirmed," *PDR.*

1994 (48th ed. at 2203) (Demulen), they do not suggest that women who have used the pills while pregnant should receive special warnings.

enhance the risk of developing [neural tube anomalies], monitor such patients with particular care when using OCs." *Id.* at 377–378.

The potential risks to the fetus were never discussed with Kathie Basten. Ms. Basten was never informed that her oral contraceptives placed her at risk of having a child with a neural tube defect. Had she been so advised, the AFP test would have been offered as a means to detect the defect. Only in this way could Kathie Basten have been apprised of the "advisability of continuation of the pregnancy." Without question, the health providers certainly failed to monitor Ms. Basten "with particular care."

■ In addition, Dr. Klaven testified that Molly's defect was so severe that it could have been detected through the use of ultrasound sonography even in the absence of AFP testing. In either case, Ms. Basten was insufficiently advised that potential risks existed. Therefore, even if Kathie Basten had been offered an AFP test as the United States insists she was, the United States would have fallen below the standard of care for not warning her of the potential harm of the oral contraceptives and for failing to recommend that another ultrasound be done. The ultrasound would have properly been performed on the October 4 visit. Therefore, even if the standard of care did not require a woman on oral contraceptives to be directed to a genetic testing center, it did require that she be informed of this option.

Defendant argues that the standard of care did not require that a woman on contraceptives be treated any differently from anyone else. The government relies on the following passages from a September 1988 ACOG Committee Opinion as support for its position:

> The potential teratogenicity and mutagenicity of various methods of fertility regulation have been alleged but not substantiated by scientific research or consensus.
>
> \* \* \* \* \* \*
>
> A pregnant woman who has taken oral contraceptives during pregnancy should be advised that all pregnant women have a 2—3% risk of delivering an infant with a major congenital malformation. Her decision to continue the pregnancy should be based on an understanding of this risk.

(ACOG Committee Opinion 62; PEx. 20.)

Admittedly, this passage is cryptic. It states that the harmful effects of birth control pills during pregnancy have not been confirmed, but it nonetheless singles out women who have taken such pills during pregnancy for a special warning. It is odd that the warning would be recommended for birth control users in particular, since the warning is one which addresses the risks to *all* women. Because ACOG recognized that birth control pill users require unique warnings about defects, it is only reasonable to assume that women like Kathie Basten deserved to be given a warning in connection with their use of the contraceptives. No such warning was given. Moreover, the court accepts Dr. Klaven's testimony, supported by his references to the drug reference manuals, as accurately stating the national standard of care. The government breached its duty to meet the standard of care in both its failure to offer AFP testing and in its failure to treat a pregnant user of oral contraceptives with particular care.

C. Proximate Cause

■ Having found that the government breached its duty in several respects, the court has little trouble finding that these breaches proximately caused the wrongful birth. Both parties agree that AFP testing would have revealed the neural tube defect. In the absence of such testing, Dr. Klaven testified that an appropriately timed ultrasound would have also detected the defect.

The court finds that had Kathie Basten been offered an AFP test, she would have accepted it. She would have consented to an ultrasound as well, for she did undergo an ultrasound on August 17, a date too early to find the defects. Had Kathie undergone either one of these tests during the appropriate time, Dr. Klaven testified, and the government did not dispute, then the defect would have been discovered. Once the defect was discovered, Kathie Basten would have elected to have an abortion.

The parties stipulated that when a neural tube defect occurs, the pregnancy is terminated 90 percent of the time. Kathie Basten has evidenced her willingness to undergo an elective abortion. She had an abortion before her pregnancy with Molly, and she has had one since her pregnancy with Molly. In addition, the Bastens demonstrated their belief that Molly would suffer less if she was not forced to undergo life-saving procedures when they withheld their consent to such procedures at Keesler Air Force Base in the absence of a court order. This is not to say that the Bastens do not love Molly now; it is only to say that their concern that she not suffer would have impelled them to abort the fetus had they been given the choice.

The only evidence to the contrary is found in Kathie Basten's statement during the January 5, 1989 meeting in Dr. Whittington's office. Shortly after Kathie Basten was reprimanded by Dr. Whittington for not visiting the clinic during the interval between weeks 16 and 20 of the pregnancy, she was informed of the neural tube defect and immediately became distraught, upset and emotionally pained. During the course of this conversation, Kathie Basten stated that she would not have had an abortion even had she known about AFP testing. Her husband confirmed that Kathie Basten said this to Dr. Whittington.

The court finds that this statement did not accurately reflect Kathie Basten's genuine sentiment. The statement was made under extreme stress and emotional strain. At the time the statement was made, the injury was irreparable and the possibility for having an abortion had passed. In the court's opinion, Ms. Basten's response was an emotional one, an attempt to make the best of a seemingly tragic situation, as well as a means to deflect charges that she was somehow responsible for the clinic's failure to schedule her an appointment during weeks 16—20. It is evident that such a statement belied Kathie Basten's true attitude toward the abortion process.

### D. Damages

Molly has endured more discomfort in the first few years of her life than most of us can ever expect to encounter. She has been unable to walk, with no use of her legs. She has been unable to autonomously relieve herself of bodily wastes. She has undergone several surgical procedures, each of which portended the potential for increasing her disability or ending her life. The discomfort that she will continue to experience cannot be gainsaid.

 Yet her injuries are not the compensable ones. Damages derivatively encountered by her parents, and by her older sister,[6] however, may be recovered. The most difficult issue in this case is how these damages are appropriately and fairly calculated. The Alabama Supreme Court has held that the birth of a seriously deformed child in a wrongful birth case results in compensable injury to the child's parents. *Keel v. Banach,* 624 So.2d 1022, 1027 (Ala.1993). In *Keel,* the court determined that the following items are compensable to the parents in a wrongful birth case: "(1) any medical and hospital expenses incurred as a result of a physician's negligence; (2) the physical pain suffered by the wife; (3) loss of consortium; and (4) mental and emotional anguish the parents have suffered." *Id.* at 1030. Although it is comparatively less difficult to calculate medical and hospital expenses in-

---

**6.** The court reluctantly awards damages to Abbie Basten only because the parties jointly stipulated that she could recover damages for any loss of parental services. Although Judge Thompson determined that minor children could recover damages for loss of parental services in *Barton v. American Red Cross,* 804 F.Supp. 1455, 1463–65 (M.D.Ala.1992), that case did not involve a wrongful birth, but rather involved an actual physical, life threatening, injury to the mother. This court, however, has failed to discover any appellate decision in which damages for loss of consortium have been awarded to a minor sib-

ling in a wrongful birth case. *See, e.g. Azzolino v. Dingfelder,* 315 N.C. 103, 337 S.E.2d 528, 537 (N.C.1985) (rejecting a sibling's claim for damages), *cert. denied,* 479 U.S. 835, 107 S.Ct. 131, 93 L.Ed.2d 75 (1986). Awarding such damages, in the absence of stipulation, places the court in the position of having reasonably to calculate the incalculable. How much is required in monetary damages to compensate for the mental anguish of a sibling because the mother or father is able to give less time to the sibling due to spending much more time with a birth injured brother or sister?

curred or to be incurred by reason of the child's physical disabilities than the emotional pain and anguish suffered by the parents, none of the damages can be calculated by a slide rule; none is capable of precise measurement. The court will consider the medical and hospital expenses first.

■ Dr. Fred Johnson, a professor of economics employed as plaintiffs' expert, testified to the value of the extraordinary expenses associated with nursing Molly. Maria Lynn Munroe, a rehabilitation consultant, explained that Molly would require numerous medical services as a result of the spina bifida. Dr. Johnson reviewed Molly's treatment plan, which included both a range of probable costs for future services as well as a range of the probable quantity of necessary future services, and used the average cost/average quantity within that range to determine the amount of damages owed when adjusted for inflation. The court believes this figure to overestimate the amount of damages actually owed. Had Dr. Johnson used the minimum quantity/minimum cost technique, the present value of damages would be $1,936,170. Had Dr. Johnson used the minimum cost/average quantity technique, the present value would be $2,748,221. A fair estimate of these costs, in the court's opinion, is $2,500,000.

The court concludes that Ms. Munroe's plan is acceptable, except that plaintiffs may not recover damages for ophthalmological care, audiologists, ENT, dental care, or speech and language therapy. None of these services was shown to have resulted from spina bifida, and the court has not awarded damages relating to these services. The court does award damages for Molly's post-majority consumption of ordinary goods. Dr. Johnson estimated the present value of those costs to be $8,421 per year. This translated into an award of roughly $155,000 until Ms. Basten reached age 70, and an award of $147,000 for Molly's life thereafter. This total of roughly $303,000 represents an overestimate; in the court's view the Basten's are entitled to jointly receive $150,000 for Molly's post-majority consumption needs.

Dr. Johnson testified that in determining a below-market discount rate for the present value of the life care plan he used three-year government bonds as the exclusive investment vehicle. This procedure yielded a zero discount rate. Although investing in three year government bonds returns a minimal yield for the sum invested, the Government presented no evidence that a different investment would be more appropriate. Accordingly, the court accepts the zero discount rate proffered by Dr. Johnson.

The Government's contention that recoverable expenses only include those expenses incurred until Molly reaches majority cannot be reconciled with *Ex parte Brewington,* 445 So.2d 294 (Ala.1983). *Brewington* recognized "a duty imposed on parents to support their children who continue to be disabled beyond their majority." *Id.* at 297. The government's additional contention—that if extraordinary expenses are allowed into Molly's adulthood, they should end when Kathie's life ends, rather than when Molly's ends—does not seem to comport with *Keel*'s mandate that "extraordinary expenses," flowing from the defendant's *negligence,* are recoverable. After all, parents devoted to a severely handicapped child would surely feel obligated to provide for that child's extraordinary needs that continue to exist after the parents have died. Because such parents could reasonably be expected to save to provide for the child, these expenses are recoverable.

Even if the extraordinary expenses were not recoverable as expenses beyond Kathie's life expectancy, the court has considered the fact that such damages have been awarded herein as a reason for reducing some of the anguish the Bastens would otherwise suffer if they had no means of providing for Molly's future care. Thus, the costs of care and consumption for Molly, during the years from 2038 to 2065, would have been recoverable as damages for anguish if they were not recoverable as expenses. A fair estimate of the costs relating to the care of Molly, over the entirety of Molly's lifetime, is $2,650,000.

■ The Bastens also testified to the immense pain they have both had to endure. Their damages include the shock of learning of this child's abnormality, as well as the significant amount of time that is required to

take care of Molly's basic needs. These needs include changing her catheter every four hours, taking her to therapy, and attempting to enrich her very difficult life. As noted, one of the primary causes for anguish for the parents of Molly would be their awareness of the substantial expenses for Molly not only while they are alive to care for her, but for those expenses continuing after the parents are deceased. The anguish is also caused by the knowledge that the financial resources needed to care adequately for Molly would diminish their financial ability to provide for their other child, Abbie. The sum awarded in this judgment will alleviate this concern and anguish.

Kathie is awarded $900,000 for anguish and mental suffering; Jonathan, her husband, is awarded $700,000 for anguish and mental suffering. It is appropriate to award Kathie more for anguish than her husband for numerous reasons: Kathie was forced to undergo the caesarean section and the other medical procedures associated with birth; the trial testimony revealed that her several encounters with unsympathetic medical personnel were more traumatic for her, particularly because she was frequently the one who spoke with the personnel directly; Kathie understood the import of Dr. Whittington's diagnosis of spina bifida when she was given the information on January 5, 1989, whereas her husband did not grasp the significance of the handicap until much later; and Kathie retains greater responsibilities for the day-to-day care of Molly than does her husband. Although the court reiterates that the anguish caused by the day-to-day care of Molly does not mean that Kathie loves Molly any less, Kathie's anguish is nonetheless heightened because she is consistently reminded of the daily hurdles and complications Molly must inevitably confront. The parents are jointly awarded $2,650,000 for the expenses and care incurred by Molly to date and what she will incur in the future. In addition, Kathie is awarded $50,000 for loss of consortium; Jonathan is awarded $50,000 for loss of consortium.

By stipulation, Abbie Basten is entitled to damages for loss of parental services. *Barton v. American Red Cross*, 804 F.Supp. 1455, 1463–65 (M.D.Ala.1992); *see also Joint Stipulation*. However, Abbie may only recover for loss of services, but not for loss of society. *Id.; Edwards v. United States*, 552 F.Supp. 635 (M.D.Ala.1982). Loss of services includes "loss of that care, counsel, training, and education which [a child] might ... have reasonably received from the parent." *Edwards*, 552 F.Supp. at 640 (quoting *Michigan Central Railroad Co. v. Vreeland*, 227 U.S. 59, 71, 33 S.Ct. 192, 195, 57 L.Ed. 417 (1913)). Because Abbie will be deprived of significant services, she is entitled to damages in the amount of $25,000.

## IV. CONCLUSION

A judgment will be entered in accordance with this memorandum opinion.

## JUDGMENT

In accordance with the attached memorandum opinion, it is the ORDER, JUDGMENT and DECREE of this Court that plaintiffs have and recover from defendant United States of America as damages the total sum of $4,375,000 which sum is awarded as follows:

1. To Kathie J. Basten and Jonathan A. Basten, jointly, the sum of $2,650,000;

2. To Kathie J. Basten the sum of $950,000;

3. To Jonathan A. Basten the sum of $750,000;

4. To Jonathan A. Basten, for the use and benefit of Claire Abigail Basten, a minor, the sum of $25,000.

It is further ORDERED that court costs are taxed against the defendant.